UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

COMERICA BANK,

　　　　　　　　　　　　　　　　Case No. 2:16-cv-10883

　　*Plaintiff*,

v.

　　　　　　　　　　　　　　　　Hon.

JOHN F. WOODSON d/b/a
TOO CUTE BEADS;
KAREN WOODSON;
SELECTIVE INSURANCE COMPANY
OF SOUTH CAROLINA;
WELLS FARGO BANK,
NATIONAL ASSOCIATION;
GLOBE MIDWEST CORPORATION
d/b/a GLOBE MIDWEST/ADJUSTERS
INTERNATIONAL; and,
TOO CUTE BEADS, L.L.C.;

　　*Defendants*.

_____/

**COMPLAINT**

Plaintiff, by counsel, alleges:

## THE PARTIES & JURISDICTION

1. Plaintiff Comerica Bank ("Comerica") seeks interpleader relief under 28 U.S.C. 1335 which is appropriate because, among other things, Comerica may be exposed to double or multiple liability as a consequence of the transactions described in this complaint.

2. This interpleader relates to the proceeds, $316,631.26, of a check (the "Check") deposited into a Comerica account with terminal numbers x6368 ("Account") titled only to "John Woodson d/b/a Too Cute Beads". (**Exhibit-1**, Check with redactions; **Exhibit-2**, Deposit Ticket with redactions; **Exhibit-3**, Signature Card & Related Documents with redactions; **Exhibit-4**, Customer Monthly Statement of Account with redactions and omitted figures).

3. This Federal District Court has subject matter jurisdiction under 28 U.S.C. 1335 because:

    a. The Check and the interpleader fund exceeds $500;

    b. Two or more adverse claimants claim, or may claim, to be entitled to the Check proceeds or a like amount arising out of the Check transactions described in this complaint; and,

    c. Diversity of citizenship exists between at least two or more of the potential adverse claimants.

4. Comerica is a Texas banking association organized under Texas law with its principal place of business in Dallas, Texas.

5. Defendant John F. Woodson is a Michigan citizen, resides in this judicial district (Farmington, MI), and does business as "Too Cute Beads".

6. Defendant Karen Woodson is a Michigan citizen and resides in this judicial district (Farmington, MI).

7. Defendant Globe Midwest Corporation d/b/a Globe Midwest/Adjuster International is organized under Michigan law and is a citizen of that state.

8. Defendant Selective Insurance Company of South Carolina is a liability and casualty insurer authorized to conduct business in Michigan. This defendant's licensing address is in Carmel, Indiana and, on information and belief, its home office is in Branchville, New Jersey.

9. Defendant Wells Fargo Bank, National Association, is a national bank association that conducts business in Michigan and is the drawee bank of the Check. Defendant Wells Fargo is a South Dakota citizen for purposes of determining jurisdiction because its main office is in Sioux Falls. (*See* 28 U.S.C. 1348).

10. Defendant "Too Cute Beads, L.L.C." may be, on information and belief, a limited liability company according to the payee line on the Check. "Too Cute Beads, L.L.C." was not a Michigan entity as of February 24, 2016, which is the date when the Check was deposited into the Account (apparently, on March 10, 2016, a Michigan entity was formed called "Too Cute Beads, L.L.C.", according to the State of Michigan Department of Licensing website).

11. Venue is proper in this district under 28 U.S.C. 1391(a) because a substantial part of the events or omissions giving rise to this civil action occurred in this district, and because one or more defendants is/are domiciled in this district.

12. The amount in controversy, $316,631.26, exceeds the $500 jurisdictional limits of this district court.

### INTERPLEADER COUNT

13. Defendant "John Woodson d/b/a Too Cute Beads" is the title owner of the Account at Comerica that is governed by an account agreement. (**Exhibit-2**, Signature Card & Related Documents; **Exhibit-5**, Account Agreement).

14. On February 24, 2016, the Check was deposited into the Account. The particulars regarding that Check include:

| DRAWER: | Selective Insurance Company of South Carolina |
|---|---|
| DRAWEE: | Wells Fargo Bank, National Association |
| PAYEES: | "Too Cute Beads LLC and Globe Midwest Adjusters Intl" |
| CHECK #: | 009586597 |
| ISSUED: | February 12, 2016 |
| AMOUNT: | $316,631.26 |
| DEPOSITED: | February 24, 2016 |

(**Exhibit-1**, Check; **Exhibit-2**, Deposit Ticket; **Exhibit-4**, Account Statement).

15. The Check was deposited after purportedly having been endorsed by payee "Globe Midwest Adjusters International". (*See* **Exhibit-1**).

16. Joint payee "Too Cute Beads, L.L.C." did not endorse the Check, and the Account was not titled to nor owned by an entity called "Too Cute Beads, L.L.C."

17. After deposit of the Check, Comerica complied with normal banking procedures and in good faith presented or transferred the Check, or an electronic image thereof, to the drawee, defendant Wells Fargo Bank, National Association.

18. Comerica received payment from the drawee bank and credited the Account in the amount of the Check, i.e., $316,631.26.

19. For the reasons stated in this complaint, and while operating under §3.05 and other provisions of the Account Agreement and other applicable law, Comerica froze the Account and took steps to protect the proceeds of the

Check, i.e. $316,631.26 (the "Fund"), pending the adjudication of this civil action.

20. Various circumstances indicate the potential for one or more conflicting claims arising out of the Check transaction described above, including, but not necessarily limited to, the following:

   a. When the Check was deposited into the Account, there was no Michigan limited liability company organized under Michigan law called "Too Cute Beads, L.C.C."

   b. Joint payee, "Too Cute Beads, L.L.C.", did not endorse the Check as drawn and therefore has a potential conversion claim arising out of its interest, if any, in the Check.

   c. Drawer Selective Insurance Company of South Carolina may have a claim because its customer's account (i.e., defendant Selective Insurance) may have been improperly debited for a transaction that was not properly payable.

   d. Drawee Wells Fargo Bank, National Association, may have improperly debited the account of its customer, Selective Insurance Company of South Carolina, and therefore may have a warranty claim.

21. For initiating and prosecuting this civil action for the benefit of others, Comerica is entitled to be reimbursed directly from the Fund for its attorney fees and costs.

22. Except for reimbursement of its attorney fees and expenses, Comerica has no claim to the Fund and is unable to determine, without hazard to itself, which defendant(s) is/are entitled to some or all of the Fund.

23. Comerica is ready and willing to deposit the Fund with the Court or with any person designated by order of the court to receive some or all of the Fund.

24. Comerica has no means other than this civil action of protecting itself against exposure to multiple claims from the defendants as to the referenced Fund.

25. Comerica requests and is entitled to interpleader relief.

WHEREFORE, Plaintiff Comerica Bank requests entry of this Court's order that:

A. Requires defendants to answer this complaint, setting out in detail all claims to the Check and to the Fund;

B. Requires defendants to settle and adjust their claims among themselves or, on their failure to do so, settle and adjust the claims and determine to whom the disputed Fund should be paid in whole or in part;

C. Directs the Clerk of the Court to accept the Fund tendered by Comerica and to hold it pending the final determination in this civil action;

D. Awards Comerica complete interpleader relief that includes, among other things, a discharge of and from all liability to all defendants: on account of the transactions and actions described in this complaint; the Check deposit at Comerica; the presentment and/or transfer of the Check, or an electronic image thereof, and receipt of payment; the hold placed on the Account; the

establishment of the Fund; and the tender and payment of the Fund as may

be ordered by this Court;

E.   Restrains defendants from prosecuting any action against Comerica until the

final determination of this civil action;

F.   Require defendants to show cause why the restraining order should not be

made a preliminary injunction and why Comerica should not be discharged

from liability;

G.   Awards to Comerica from the Fund the reasonable costs and attorney fees

expended in commencing this action; and

H.   Grant such further relief as the court may deem proper and equitable.


Dated: March 11, 2016                          s/ David F. Wells
                                               Stancato Tragge Wells, P.L.L.C.
                                               *For* Comerica Bank
                                               Two Towne Square, Suite 825
                                               Southfield, MI  48076
                                               (248) 731-4500
                                               dwells@stwlawfirm.com
                                               P47588

## EXHIBIT LIST

| | |
|---|---|
| **Exhibit-1** | Check |
| **Exhibit-2** | Deposit Ticket |
| **Exhibit-3** | Signature Card & Related Account Documents |
| **Exhibit-4** | Monthly Statement of Account |
| **Exhibit-5** | Account Agreement |

EXHIBIT-1



THIS CHECK IS VOID WITHOUT A RED & BLUE , RED BACKGROUND AND AN OPAQUE WATERMARK ON BACK • HOLD TO LIGHT TO VIEW DIAMOND PATTERN

SELECTIVE®   Selective Insurance Company of South Carolina   Wells Fargo Bank, NA   Wilmington, DE 19801   43-33 / 311   Check No.  009586597

Issued by Corporate Claims

February 12, 2016
Void After 90 Days

Claim Number   01
Claimant

$316,631.26

The Sum of

*Three Hundred Sixteen Thousand Six Hundred Thirty One and 26/100 Dollars*

Insured   TOO CUTE BEADS LLC
Claimant   Too Cute Beads LLC

BPP loss damages, DOL
10/24/15.

Pay
to
The
Order
of

TOO CUTE BEADS LLC
AND GLOBE MIDWEST ADJUSTERS INTL

023339929   02-24-16   28

SOUTHFIELD MI   48075

*Gregory E. Murphy*
*Dale A. Thatcher*

BORDER CONTAINS MICROPRINTING

THIS CHECK ALSO CONTAINS THE FOLLOWING SECURITY FEATURES

1. MICRO PRINTING on borders on back. Under magnification LOOK FOR SELECTIVE INSURANCE
2. Face of check has a RED BLUE /RED BACKGROUND
3. OPAQUE WATERMARK on Back. Hold to Light to view.
4. SIGNATURE AREA contains a wavy line background

-COMERICA
LIVONIA, MI MI   8621
023339929  02-24-16      >072000096<

Globe Midwest Adjusters International

By:

EXHIBIT-2

hold m

**ComericA Bank**   **MMIA / Checking / Savings Deposit**

CP01642 (05/08)

| | | | | Yr. | Mo. | Day | Cash | | |
|---|---|---|---|---|---|---|---|---|---|
| Date 2/24/2016 | | | Exception Date | | | | Checks | 316,631 | 26 |
| Name Too Cute BBADS. | | | | | | | | | |
| Present Address | | | | | | | | | |

*PLEASE NOTIFY TELLER OF CHANGE OF ADDRESS*

This deposit subject to Comerica's Business and Personal Deposit Account Contract.

| | Sign Here for Less Cash | | |
|---|---|---|---|
| For Credit Account 023339928  02-24-16  13 | Sub Total | | |
| ☒ CHECKING   ☐ SAVINGS | Less Cash Received | | |

\*  ▮▮▮▮▮▮ 6368         Net Deposit  $ 316,631.26

▮▮▮▮▮▮▮         3E

COMERICA                    >072000096<
PROCESSED*MI         8621
023339928  02-24-16

00055    02/24/16    XXXXX6328      316,631.26
2DDAZ  22808    14:25    Y    DDA    D4  31

# EXHIBIT-3

John Woodson dba
**Account Registration**
Too Cute Beads

**Account Address**

**Authorized Signers:**

| Printed Name | Title | Identification | Signature |
|---|---|---|---|
| John F Woodson | Pros. | | |
| Karen J. Woodson | V. Pres. | | |

Account Number ███████ 6368
Opening Date 10-10-02
Type of Account: ☒ Checking    ☐ Savings
☐ Time Deposit

Telephone Number
Tax Identification Number

Original Branch No. 22B    Branch Initials
Officer Number    Effective Date 4-19-05

☐ Attachments. Attach additional names and signatures, including Simulated Signatures.
The Account Owner agrees to all terms listed on the back of this card.

Signature

Title:    ☐ Secretary / Assistant    ☐ Partner    ☐ LLC Manager / Member    ☐ Sole Proprietor    ☒ Pres.    Date

 **Comerica Bank Business Account Signature Card**

By signing on the reverse side of this Signature Card, you agree:

1. The Account designated on the reverse side is subject to our Business and Personal Deposit Account Contract, (which includes a Fee Brochure and, if applicable, an APY disclosure) which you have received.
2. **TO WAIVE YOUR RIGHT TO A JURY TRIAL INVOLVING ANY DISPUTE REGARDING YOUR ACCOUNT AND RELATED SERVICES.**
3. We may share information about you, this Account, and any transaction involving this Account with our parent company, affiliates, and subsidiaries, and as otherwise disclosed in the Contract or required by law.
4. The Authorized Signatures on the reverse side are those of the Authorized Signers and any one (1) of the Authorized Signers may transfer or withdraw funds in the Account by any method we may allow.
5. There are no unwritten oral agreements between us regarding this Account including overdraft protection arrangements.

*The IRS does not require your consent to any provisions of this document other than the certifications required to avoid backup withholding.*

I have read the detailed instructions concerning backup withholding and taxpayer identification numbers and I **CERTIFY UNDER PENALTIES OF PERJURY THAT**(1) the number shown on the reverse side of this card is my correct taxpayer identification number and (2) I am not subject to backup withholding because: (a) I am exempt from backup withholding, (b) I have not been notified by the IRS that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS notified me that I am no longer subject to backup withholding and (3) I am a U.S. person (including a U.S. resident alien). **(Instructions to signer:** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you failed to report all interest and dividends on your tax return.) **Note:** Exempt recipients, as described in Section 1.6049-4(c) of the Federal Tax Regulations, are not subject to backup withholding. Non U.S. persons (nonresident aliens) who are not subject to backup withholding are required to sign the appropriate Form W-8 or Substitute W-8BEN Bank form.

(S) _____          4-10-03
Signature of Primary Account Owner / Authorized Signer          Date
MI01799 (05/01)

## Certificate of Persons Conducting Business Under Assumed Name (Act No. 151, P.A. 1949)

STATE OF MICHIGAN } ss.
COUNTY OF OAKLAND }

_I_ (We or I), the undersigned, whose name _I_ signed in full below, do (We or I) hereby certify, in pursuance with Act No. 151, P.A. 1949, as amended, for the state of Michigan that _I_, the undersigned now own (or) intend to own, conduct and transact business at ▮▮▮▮▮▮▮▮▮▮

_Farmington_ County of _Okland_, Michigan, Zip _48336_ under the assumed name, designation and style of _Too Cute Beads_

with Description of Business _Bead & Jewelry store_

And _I_ (We or I) do further certify that the true and real full names of all the persons who now own (or) who intend to own, conduct and transact the same, together with the residence addresses of each of the said persons, are as follows, viz:

| NAME | RESIDENCE ADDRESS | CITY OR VILLAGE | ZIP |
|------|-------------------|-----------------|-----|
| John Woodson | ▮▮▮▮▮▮▮▮▮ | Farmington | 48336 |
| | | | |
| | | | |

_In Witness Whereof_, we have this _____ day of APR 0 9 2003 A.D. _____, made and signed this certificate.

THIS CERTIFICATE EXPIRES APR 0 9 2008

### SIGNATURES OF PERSONS CONDUCTING BUSINESS UNDER ASSUMED NAME

_(signature)_

STATE OF MICHIGAN } ss.
COUNTY OF OAKLAND }

On this _____ day of _____ APR 0 9 2003 _____, before me, a Notary Public, personally appeared the above named person or persons, whose signatures appear above, and who executed the foregoing instrument, and ___he___ acknowledged to me that ___he___ executed the same, and that they are all of the persons owning, conducting and transacting or who intend to own, conduct and transact the business under the above name, style and designation.

Notary Public, M. Wishaw
My Commission Expires Oakland County, Michigan

_M Wishaw_
Notary Public, _Oakland_ County, Michigan
My commission expires _October 7, 2006_

STATE OF MICHIGAN } ss.
COUNTY OF OAKLAND }

Clerk of the County aforesaid and Clerk for the Circuit Court for said County, do hereby certify that I have compared the within copy of Certificate setting forth the full names of the persons owning, conducting or transacting business under the name inscribed above together with the certificate of filing endorsed thereon, with the original Certificate heretofore filed and now remaining in my office, and that it is a true and correct copy thereof, and of the whole or such original Certificate of said certificate of filing.

_In Testimony, Whereof,_ I have hereunto set my hand and affixed the seal of the Circuit Court of said County of Oakland, at Pontiac, this _____ day of _____ APR 0 9 2003 _____, A.D. _____

954570

G. WILLIAM CADDELL, County Clerk-Register of Deeds

By: _M Wishaw_
Deputy Clerk

C-45 (4-99)

**Note:** This Certificate must be renewed within five (5) years from date. If you change your place of business you must notify this office. If you change the personnel above listed you must file Notice of Discontinuance and a new Certificate with this office. If you discontinue your business you must file Notice of Discontinuance with this office.

**Comerica**   Declaration and Agreement for Opening and Maintaining Deposit Account(s) and Treasury Management Services

Check One:  ☐ New Deposit Account(s)     ☒ Change(s) to Existing Deposit Account(s)

Too Cute Beads
NAME OF BUSINESS CUSTOMER

███████████   ████████████  Farmington MI 98336
PRINCIPAL ADDRESS

Date Received by Bank _____ 4-10-03 _____

**DECLARATION AND AGREEMENT:**

1.  This Declaration and Agreement applies to:   *{Select only one of the following with an "X"}*
    ☒ All Deposit Accounts (checking, savings, time deposits) of Customer.
    ☐ Only Accounts (provide account numbers): _____

    **(If you fail to select one of the above choices and no specific account(s) are designated, this Declaration and Agreement will apply to all of Customer's existing and future deposit accounts at Bank and will supersede all prior Customer Declarations and Agreements, Resolutions, Authorizations and the like.)**

2.  Comerica Bank, Comerica Bank-California, Comerica Bank-Texas, Comerica Bank & Trust, N.A. ("Bank") are hereby designated as depository institutions and treasury management/cash management service providers of Customer, and if designated in 4c, institutional cash investment account provider of Customer.

3.  **DEPOSIT ACCOUNT AUTHORIZED SIGNERS.** Any one (1) of the persons named in this section ("Authorized Signer") is authorized on behalf of Customer to:
    (a) enter contracts regarding the establishment of deposit accounts; and
    (b) make withdrawals or request transfers from such deposit accounts in any manner or form the Bank may make available:

    TYPE OR PRINT NAMES AND TITLES (if any) OF AUTHORIZED SIGNERS:

    John E. Woodson  Vice Pres.  _____
    Karen J. Woodson, President  _____
    _____  _____

    *(Attach additional pages if more space is required)*

    The signatures and titles (if any) of the Authorized Signer(s) will be duly certified by Customer's authorized representative on a Bank Signature Card, as those persons authorized to make withdrawals or transfers from the deposit accounts. Transfer requests and withdrawals will be valid if ordered by: (i) an Authorized Signer or (ii) someone authorized to do so pursuant to the applicable deposit account contract or (iii) any person or entity designated in any other agreement entered by Customer and Bank. As changes, including additions and deletions, in the Authorized Signer(s) are made, the Customer's authorized representative shall immediately certify such changes by presenting a new Bank Signature Card or other written communication acceptable to Bank, and, if requested by Bank, provide a new Declaration and Agreement reflecting such changes. Bank shall be fully protected in relying on such documentation and shall be indemnified and held harmless from any claims, demands, expenses, loss or damage resulting from or growing out of honoring the signatures so certified, or refusing to honor any signatures not so certified.

4.  **TREASURY MANAGEMENT AUTHORIZED SIGNERS.** Any one (1) of the persons named below ("TM Authorized Signer") is authorized on behalf of Customer without the concurrence of any Authorized Signer listed in Section 3 to:

    **{Select 4(a) with an "X" *only* if applicable}**
    ☐ (a) Designate others who are authorized on behalf of Customer to enter into contracts described in this section.

    (b) Terminate all contracts described in this section.

    **{Select with an "X" only *one* statement labeled in section (c)}**
    ☐ (c) Execute all contracts related to treasury management/cash management services including investment services/products.
    ☐ (c) Execute all contracts related to treasury management/cash management services, **but not** investment services/products.
    ☐ (c) Execute all contracts related only to investment services/products.

    **(If you fail to make a selection in Section 4(c), but have designated at least one TM Authorized Signer below, this Declaration and Agreement will apply to all contracts related to treasury management/cash management services including investment services/products and will supersede all prior Customer Declarations and Agreements, Resolutions, Authorizations and the like concerning such services/products.)**

    TYPE OR PRINT NAMES AND TITLES (if any) OF TM AUTHORIZED SIGNERS:

    **{Select with an "X" only if applicable}**   ☐ The TM Authorized Signers are exactly the same as Authorized Signers in Section 3 above.

    _____  _____
    _____  _____

    *(Attach additional pages if more space is required)*

5.  All funds in the Customer's account with Bank may be paid out, transferred or withdrawn when requested by an

EXHIBIT-4



80228

JOHN WOODSON DBA TOO CUTE BEADS

███████████

FARMINGTON MI ███████████

*Small Business Checking*
**statement**
**February 1, 2016** to **February 29, 2016**
**Account number** ███████6368

# Account summary

**Beginning balance
on February 1, 2016**

Plus  deposits

Electronic deposits

Paper deposits ............................................. $316,631.26

Less  withdrawals

Checks

ATM/Debit Card withdrawals

Electronic (EFT) withdrawals

**Ending balance
on February 29, 2016**

**To contact us**

**Call**
(800) 643-4418
Hearing impaired (TDD 800 822-6546)

**Visit our web site**
www.comerica.com

**Write to us**
COMERICA BANK
PO BOX 75000
DETROIT, MI 48275-8228

**Important information**

The Account Balance Fee for this statement
period for this account is $0.00/$1,000.

**Thank you**

*Small Business Checking* statement
**February 1, 2016** to **February 29, 2016**

# *Small Business Checking* account details: ████6368

## Paper deposits this statement period

| Date | Amount($) | Reference numbers | | Date | Amount($) | Reference numbers | |
| | | Customer | Bank | | | Customer | Bank |
|---|---|---|---|---|---|---|---|
| Feb 24 | 316,631.26 | | 0023339928 | | | | |

**Total Paper Deposits: $316,631.26**
**Total number of Paper Deposits: 1**

EXHIBIT-5



**ComericA Bank** ®

# BUSINESS AND PERSONAL DEPOSIT ACCOUNT CONTRACT

SM

**Table of Contents**

| | | |
|---|---|---|
| 1.00 | **Definitions** | 2 |
| 2.00 | **Terms Applying to All Accounts** | 3 |
| 2.02 | Opening the Account | 3 |
| 2.04 | Laws, Rules, Regulations | 3 |
| 2.05 | Use of Your Account | 3 |
| 2.06 | Joint Owners | 3 |
| 2.07 | Changes in Account Ownership, | |
| | Address and Authorized Signers | 4 |
| 2.08 | Adjustments | 4 |
| 2.08.02 | Returned Items | 4 |
| 2.10 | Assignment/Pledge/Transfer | 4 |
| 2.12 | Security Interest | 4 |
| 2.14 | Set Off | 4 |
| 2.15 | Posting Order | 4 |
| 2.16 | Deposits | 4 |
| 2.16.02 | Endorsements | 5 |
| 2.16.04 | Night Depository/Night Drop | 5 |
| 2.16.06 | Items Sent for Collection | 5 |
| 2.16.08 | Demand Drafts | 5 |
| 2.18 | Checks | 5 |
| 2.18.02 | Checks Bearing Notations | 5 |
| 2.18.04 | Postdated Checks | 5 |
| 2.18.06 | Stale-Dated Checks | 5 |
| 2.18.07 | Checks Written For More | |
| | Than $99,999,999.99 | 5 |
| 2.18.08 | Words vs. Numbers | 5 |
| 2.18.10 | Stop Payments | 5 |
| 2.18.12 | Check Verification | 6 |
| 2.18.13 | Check Clearing for the 21st Century | |
| | Act and Your Rights | 6 |
| 2.18.14 | Check Cashing (Non-Account holder, | |
| | check drawn on Comerica Bank) | 6 |
| 2.18.16 | Payable Through Drafts | 6 |
| 2.18.20 | Electronic Check Representment (RCK) | 6 |
| 2.20 | Withdrawals | 6 |
| 2.20.02 | Authorized Signature | 6 |
| 2.20.04 | Withdrawals by Legal Representative | 7 |
| 2.20.06 | Withdrawal Limitations and Penalties | 7 |
| 2.20.08 | Funds Transfers/ACH | |
| | Transactions (Outgoing) | 7 |
| 2.20.10 | Withdrawals/Transfers by Telephone | |
| | or Electronic Order | 7 |
| 2.20.11 | Automated Transfers Between Bank | |
| | Checking Accounts | 7 |
| 2.20.12 | Debiting Your Account | 8 |
| 2.20.14 | Non-Sufficient Funds (sometimes referred to | |
| | as Insufficient Funds) and Overdrafts | 8 |
| 2.20.16 | Dishonor of Items for Protection | |
| | of Your Account | 8 |
| 2.20.18 | Cashing Checks and Cash Withdrawals | 8 |
| 2.20.20 | Cutoff Hour | 8 |
| 2.22 | Waiver of Protest, Dishonor, Non-Payment | 8 |
| 2.24 | Account Statements | 8 |
| 2.24.02 | Review of Statements and Notices | 8 |
| 2.24.04 | CheckPhoto | 9 |
| 2.24.06 | Check Safekeeping | 9 |
| 2.26 | Payment of Interest for Accounts that Earn Interest | 9 |
| 2.28 | Service Charges | 9 |
| 2.30 | Overdraft Protection | 9 |
| 2.32 | Closing the Account | 10 |
| 2.34 | Special Rules for TDAs | 10 |
| 3.00 | **Legal Matters** | 10 |
| 3.02 | Legal Proceedings | 10 |
| 3.04 | Legal Process | 10 |
| 3.05 | Freezing Your Account, Conflicting | |
| | Demands/Disputes | 10 |
| 3.06 | Liability | 10 |
| 3.08 | Limitation of Actions | 10 |
| 3.09 | ARBITRATION AND CLASS ACTION PROVISIONS | 10 |
| 3.10 | Jury Trial Waiver/Judicial Reference Proceeding | 12 |
| 3.12 | Release of Information | 12 |
| 3.14 | Power of Attorney | 12 |
| 3.16 | Dormant Accounts | 12 |
| 3.18 | Change in Terms | 12 |
| 3.20 | Notice | 12 |
| 3.22 | Section Titles | 12 |
| 3.24 | Miscellaneous | 12 |
| 3.26 | Amounts Due Bank | 13 |
| 3.28 | Deposit Insurance | 13 |
| 5.00 | **Additional Terms for Statutory Accounts** | 13 |
| 5.02 | Uniform Transfer to Minors Account | 13 |
| 5.04 | Statutory Trust Account | 13 |
| 6.00 | **Funds Availability Policy** | 13 |
| 6.02 | General Availability of Funds Deposited | 13 |
| 6.04 | Longer Delays May Apply | 13 |
| 6.06 | Special Rules for New Customers | 13 |
| 6.08 | Holds on Other Funds | 14 |
| 7.00 | **Electronic Funds Transfers Policy** | 14 |
| 7.02 | Transactions Available | 14 |
| 7.02.02 | Telephone and IVR Transfers and Inquiries | 14 |
| 7.04 | Other Agreements | 14 |
| 7.06 | Documentation of Transfers | 14 |
| 7.06.02 | Card Transactions | 14 |
| 7.06.04 | Preauthorized Deposits: Personal Accounts | 14 |
| 7.08 | Stop Payment and Notice of Varying Amounts | |
| | (Preauthorized Transfers): Personal Accounts | 14 |
| 7.10 | Our Liability for Failure to Make Transfers | 14 |
| 7.12 | Personal Identification Number (PIN) | 15 |
| 7.14 | Your Liability for Unauthorized Electronic Fund | |
| | Transfers | 15 |
| 7.16 | In Case of Errors, Questions, or to Report a Lost or | |
| | Stolen Card or PIN | 15 |
| 7.19 | Illegal Transactions | 16 |
| 7.20 | Unauthorized ACH Transfers | 16 |
| 7.22 | Merchants' Disputes | 16 |
| 7.24 | Termination | 16 |
| 7.28 | Daily Withdrawal and Transaction Limit | 16 |
| 7.30 | Required Michigan Disclosure – | |
| | Regulatory Agencies | 16 |
| 7.32 | ATM Safety | 16 |
| 7.34 | Originating Funds Transfer by Wire or ACH | 16 |
| 7.34.02 | Acceptance | 16 |
| 7.34.04 | Provisional Payments | 16 |
| 7.34.06 | Cancellation, Amendment and Reversal | 16 |
| 7.34.08 | Discrepancies in Payment Order | 16 |
| 7.34.10 | Rejection | 16 |
| 7.34.12 | Payment of Payment Orders and Fees | 16 |
| 7.34.14 | Fedwire | 17 |
| 7.34.16 | Notice of Receipt of ACH Items | 17 |
| 7.34.18 | Notice of Receipt of Non-ACH Items | 17 |
| 7.36 | Foreign Check Card Transactions | 17 |
| 8.00 | **Special Rules for Sweep Arrangements** | 17 |
| 8.02 | Definitions | 17 |
| 8.04 | Business Sweep Arrangements | 17 |
| 8.04.02 | Transfer Options | 17 |
| 8.04.04 | Transfers | 17 |
| 8.06 | Personal Sweep Arrangements | 17 |
| 8.06.02 | Transfer Options | 17 |
| 8.06.04 | Transfers | 17 |
| 8.08 | Terms Applicable to All Sweep Arrangements | 17 |
| 8.08.02 | Transfers and Withdrawals | 17 |
| 8.08.04 | No Investment Advice | 18 |
| 8.08.06 | Liability | 18 |
| 8.08.08 | Balances | 18 |
| 9.00 | **Special Terms for Controlled** | |
| | **Disbursement Accounts Opened at** | |
| | **Comerica Bank & Trust, N.A.** | **18** |

By signing the Signature Card, requesting an Account or making a deposit to the Account, you agree to the terms contained in the Contract, as that term is defined in Section 1.32. The terms contained in the Contract are effective February 1, 2014, unless a later date is stated, and supersede all previous Business and Personal Deposit Account Contracts. Not all products and/or services described in this Contract are available in all markets of the Bank. Terms that are different based on market of the Bank are noted.

1.00    **Definitions**

1.02    *Acceptance* means a document which you sign if we, at your request and upon our approval, establish a sweep arrangement for you.

1.06    *Account* refers to any Business or Personal Account.

1.08    *Annual Percentage Yield (APY)* is the amount of interest, expressed as a percentage rate, an Account would earn in a year at the stated interest rate and frequency of compounding.

1.10    *Annual Percentage Yield (APY)* Disclosure shows the APY for an Account based on the interest rate in effect on the day the disclosure is provided.

1.12    *Authorized Signature* is the original signature or Simulated Signature of an Authorized Signer.

1.14    *Authorized Signer* is the person(s) authorized and designated by you on the Signature Card to conduct specified Account business (including withdrawals, transfers, wire orders, etc.) including the Owner(s); and, if a Business Account, as authorized in your Declaration and Agreement for Opening and Maintaining Deposit Account(s) or other resolution/ authorization acceptable to us.

If you require more than one Authorized Signer's signature or authorization to conduct certain transactions related to the Account, this requirement will be deemed solely for your own purposes. We will not be liable to you as long as at least one Authorized Signer's signature appears on your checks, drafts, orders, or if our records indicate that a withdrawal or transfer was made by or on behalf of one Authorized Signer by telephone, Card or other method. This includes situations in which you have provided your Card and/or PIN to someone else to use and have not notified us that the person no longer has your permission to use it.

If your Account was opened at a Texas banking center and is owned by a minor, and we receive written notice from the minor's parent or legal guardian denying his or her authority to control, transfer, draft on or make withdrawals from the Account, all actions by the minor as an Authorized Signer must be joined by a parent or legal guardian until the minor reaches majority.

1.16    *Available Balance* is the Ledger Balance in your Account plus any pending electronic credits, less (a) any pending electronic debits and Card transactions for which a merchant has obtained a payment authorization, and (b) any funds which are held, frozen, or subject to encumbrances.

1.18    *Bank* ("our," "us" and "we") means the Comerica bank affiliate with whom you have established your Account, as identified on your Signature Card.

1.20    *Brochure* refers to our Business Account Service Charge and Interest Information or our Personal Services and Charges brochures, whichever is applicable, as these may be amended from time to time.

1.22    *Business Account* refers to any Account listed in the Business Account Service Charge and Interest Information Brochure.

1.24    *Business Day* refers to any weekday, excluding Saturdays, Sundays and Federal legal holidays.

1.26    *Card* is any card that is designed to access a Comerica deposit Account for the purpose of electronic funds transfer, including but not limited to a Comerica ATM Card, Comerica Check Card, or Comerica Business Check Card.

1.27    *Cash Reserve* is your Elan Financial Services issued cash reserve account, offered through Comerica Bank.

1.28    *Checking Account* is any Account identified as a Checking Account in the Brochure. All interest bearing Checking Accounts are variable rate Accounts unless otherwise stated in the APY Disclosure or, for Business Accounts, in the Brochure.

You authorize us to establish your Checking Account as a subaccount of a Master Account. The Master Account will consist of a Checking subaccount and a Savings subaccount. If your Checking Account is interest bearing, the subaccounts will be interest bearing, and interest will be paid on the balance in the two subaccounts. If your Checking Account is not interest bearing, the subaccounts will not be interest bearing. All transactions, including checks, debits, withdrawals, deposits and credits will post to the Checking subaccount. The only statement you will receive for the Master Account will be the monthly Checking subaccount statement. Periodically, we may transfer funds between the subaccounts. These transfers will not affect your access to the total funds on deposit, the Master Account balance, the interest earned, if any, or your Checking Account number.

1.30    *Collected Balance* is the Ledger Balance less deposited items in the process of collection.

1.32    *Contract* refers to this document which incorporates by reference the following:

- An Account Signature Card,

- A Brochure,

- A Request for Taxpayer Identification Number or Certificate of Foreign Status,

- A copy of the Annual Percentage Yield Disclosure (for interest bearing Personal Accounts),

- A Declaration and Agreement for Opening and Maintaining Deposit Account(s) or other resolution/authorization we accept from you (for Business Accounts),

- For IRAs, a signed IRA Beneficiary Designation and Adoption Agreement, and the Disclosure Statement and Master Terms of Individual Retirement Custodial Accounts,

- For Coverdell Education Savings Accounts (ESAs), a signed ESA Beneficiary Designation and Adoption Agreement and the Disclosure Statement and Master Terms of a Coverdell Education Savings Custodial Account.

- For sweep arrangements, a signed Acceptance,

- Any other written agreement(s) executed between us and you in relation to the Account, including the Card agreement.

1.34    *Credit Card* is your Comerica MasterCard® or Visa® credit card offered/ provided by Elan Financial Services.

1.35    *ESA* is a Coverdell Education Savings Account (formally Education IRA) established pursuant to section 530 of the Internal Revenue Code. ESAs include ESA Time Deposit Accounts (TDAs) and ESA Savings Accounts.

1.36    *Funds Transfer Business Day* is each Business Day before 4:00 p.m. Eastern Time on which we are open for purposes of processing funds transfers.

1.38    *Interactive Voice Response ("IVR" or "VoiceBank")* is a service that permits you to obtain Account information and to perform certain transactions by using a touch-tone telephone and a PIN.

1.40    *IRA* is an individual retirement arrangement established pursuant to Section 408(a) of the Internal Revenue Code. An IRA Account is an Account in which you invest contributions to your IRA. IRA Accounts include IRA Time Deposit Accounts and IRA Savings Accounts.

1.42    *Ledger Balance* is the balance in your Account that reflects posted transactions, which include deposits, credits, withdrawals and other debits.

1.44    *Non-Sufficient Funds (NSF)* (sometimes referred to as Insufficient Funds) refers to the circumstances in which we do not pay a check or other item or permit a withdrawal or transaction because the Available Balance in your Account is less than the amount of the check, item, withdrawal or transaction.

1.46   *Overdraft* is a negative Available Balance in an Account that is created when we pay a check or draft or honor a withdrawal or debit transaction in an amount which exceeds the Available Balance in the Account.

1.48   *Owner ("you" and "your")* means any of the persons or entities who are designated in the Account Registration section of the Signature Card for the Account as a legal owner of the Account.

1.50   *Personal Account* refers to Savings and Checking Accounts and Time Deposits we offer primarily to individuals, trusts, estates, custodians, guardians, and conservators, and to Savings Accounts and Time Deposit Accounts we offer as IRAs and ESAs.

1.52   *Personal Identification Number (PIN)* is the number selected by you or assigned to us for your Account or Card for security purposes.

1.54   *Savings Account* is any Account described as a Savings Account in the Brochure. All Savings Accounts are variable rate Accounts unless otherwise stated in the APY Disclosure or, for Business Accounts, in the Brochure.

1.56   *Service Charges* are any amounts assessed in connection with your Account as described in the Brochure.

1.58   *Set Off* is our right to withdraw from any Account (or any other funds or property in our possession that you have with us (or if multiple Owners, and one or more Owner has with us), to pay any debt any Owner owes to us, unless we are prohibited by law from doing so.

1.60   *Signature Card or Master Signature Card* is our document, including our Business Signature Document and Consumer Signature Document, or one that is acceptable to us, that you sign which designates the Account ownership (Account registration), the Authorized Signer(s), and the Bank. The Signature Card may contain additional terms.

1.62   *Simulated Signatures* are mechanical, facsimile, electronic, image, rubber stamp signatures, or other forms of signatures intended to be used as the signature of an Authorized Signer.

1.64   *Time Deposit Account ("TDA or "CD")* refers to any Account with respect to which you agree to maintain funds on deposit until a stated maturity date. While we may refer to these Accounts as a Certificate of Deposit "CD," it will not be evidenced by a certificate. All TDAs are variable rate Accounts unless otherwise stated in the Fee Brochure or for Personal Accounts, the APY Disclosure.

2.00   **Terms Applying to All Accounts.**

2.02   **Opening the Account.** Your Account will be considered opened when you have provided us with all of the documentation that we require, including, but not limited to a Signature Card, tax payer identification certification and, if applicable, business documentation and we have noted the Account as open on our records. The Bank requires identification and tax-payer information in order to open an Account. To help the government fight the funding of terrorism and money laundering activities, Federal law requires financial institutions to obtain, verify and record information that identifies each person or entity who opens an Account. What this means for you: When you open an Account, we will ask you and/or your representative for your name, address, date of birth (for personal Accounts), and other information that will allow us to identify you and, we may also ask to see your driver's license or other identifying documents. We may also independently verify your identity through the comparison of identifying information you or your representative have provided with information we obtain from a consumer or business reporting agency, public database or other source. Accordingly, you agree to provide true, accurate, and complete information on all forms required by us and agree to inform us anytime there is a material change to such information.

The Bank may also request additional information from you or third parties, including credit reports, at the time the Account is opened or any time thereafter. At our discretion, the Bank may refuse to open an Account, refuse to accept additional deposits into an Account, terminate check writing privileges or close an Account. You agree to notify us promptly regarding any change to information you provided to open the Account.

By signing the Signature Card or making a deposit to the Account, you agree to the terms contained in the Contract.

2.04   **Laws, Rules, Regulations.** Your Account is governed by the laws and regulations of the United States, the rules and regulations of the Federal Reserve Board, and the National Automated Clearing House Association (NACHA). In addition, except as otherwise provided by this Contract and without regard to conflict of laws and principles, your Account will also be governed, to the extent applicable, by the laws of the state in which the banking center of the Bank that maintains your Account is located, unless we have notified you in writing that the laws of a different state will apply. If you were not physically present at one of our offices when you opened your Account (for example, you opened your Account by telephone, fax, through the mail or over the Internet), your Account will be governed by the laws of the state of Michigan unless we notify you otherwise.

All items transmitted for collection to any Federal Reserve Bank will be governed by the Rules and Regulations of that bank and of the Federal Reserve Board. Payment orders that result in credits or debits to your Account may be processed through an automated clearing house system and will be subject to the NACHA rules and applicable local clearing house rules. To the extent that an ACH credit to your Account is not subject to the Electronic Fund Transfer Act, your rights and obligations with respect to such transactions will be governed by the laws of the state of New York, unless we otherwise agree in writing.

2.05   **Use of Your Account.** You agree that you will not use your Account to conduct:

1. any transaction that would violate the terms of this Deposit Contract,

2. any transaction that would violate any federal, state or local law or regulation or presidential order of the United States, including but not limited to transactions related to internet gambling if the transaction is illegal under federal, state or local law, including but not limited to the Unauthorized Internet Gambling Act, (We will prohibit and block internet gaming transactions, including those that may be legal), and

3. any transaction that is not for personal purposes, if your Account is a Personal Account.

2.06   **Joint Owners.** If your Account is designated as jointly owned by two or more persons or entities, as indicated on the Account Signature Card or our records, then each Owner agrees: (a) to be bound by this Contract, any amendments to it and any other agreement between any Owner of the Account and us regarding the Account; (b) to be jointly and individually liable for all Service Charges and overdrafts regardless of whether each Owner participates in or benefits from the transactions; (c) that any one Owner or Authorized Signer may write checks and make withdrawals or other transfers by any means we make available, and regardless of whether the withdrawal or transfer is for all or any portion of the funds on deposit in the Account or is with or without the knowledge or consent of any other Owner; (d) that any Owner or Authorized Signer may place a stop payment order on checks or other orders drawn against the Account by any other Owner or Authorized Signer; (e) that any Owner may close the Account without the knowledge or permission of any other Owner; (f) that we may exercise our Set Off rights against the Account in the event any one or more of the Owners defaults on any obligation owing to us even if the non-defaulting Owner(s) contributed all or a majority of the funds to the Account; (g) that garnishments against any one or more Owner(s) are subject to our right of Set Off and security interest; (h) that notice given to any Owner or Authorized Signer is notice to all of the Owners, unless a different notice is required by applicable law; and (i) funds in the Account are payable to any one or more of the Owners without the consent of any other Owner.

For Accounts opened at a banking center in the state of Texas, funds in the Account are owned by the Owners in proportion to each Owner's net contributions to the Account. If the account is opened at any other banking center, the funds are owned by the Owners as determined by local law.

Each joint Owner agrees, unless otherwise indicated on the Signature Card for the Account, that all money in the Account may be paid to or on the order of any Owner, either before or after the death of any other Owner. Payment by the Bank shall be valid and discharge the Bank from liability regardless of original ownership of the money deposited to the Account.

2.07   **Changes in Account Ownership, Address and Authorized Signers.** You agree to notify us immediately in writing of any change in your name, address, business capacity, or the Authorized Signers on your Account. We may require documentation evidencing this change and a new Signature Card before any change in ownership or Authorized Signers becomes effective. If the Authorized Signers, including convenience signers, on your Account change, we may continue to honor items and instructions given earlier by any previously Authorized Signers until we receive specific notice from you in writing not to do so (Note: A new or updated Signature Card, by itself, does not constitute notice to terminate any pre-existing payment or transfer plan). In some instances we may require you to close your Account or provide us with stop payment orders to prevent transactions from occurring. There may be a delay in implementing a change in the Authorized Signers on our records, and you agree that we will be given a reasonable opportunity to make the changes necessary.

2.08   **Adjustments.** We may make adjustments to your Account whenever a correction is required. Adjustments might occur, for example, if deposits are posted in the wrong amount or to your Account in error, if posting is delayed or items are returned unpaid. If our fee to make a correction is greater than the amount in question, we may elect, at our discretion, not to make an adjustment to your Account to correct an error which you or your agent cause.

2.08.02   **Returned Items.** If an item deposited to your Account is returned to us by the financial institution on which it is drawn, we may accept that return and charge the item back against the Account or a different Account that we agree to charge for this purpose, even if this charge back causes the Account to be overdrawn, and without regard to whether the item was returned to us before or after the other financial institution's midnight deadline. If the applicable Account does not have sufficient funds, we may charge the item back to any other Account you have with us. Further, if an item deposited to your Account was paid by the financial institution on which it was drawn and that financial institution later returns the item to us claiming alteration, forgery, unauthorized maker or endorser or other defense against payment, we may withhold the amount of that item from your Account until the claim is finally resolved.

2.10   **Assignment/Pledge/Transfer.** You may not assign, transfer, pledge or grant a security interest in your Account to others without our prior written consent. Pledging funds of a trust Account may be subject to additional conditions. TDAs are not transferable (except for transfers made on our books) when owned by one or more individuals or a sole proprietorship or by a trustee, custodian, agent or other fiduciary on behalf of one or more individuals. Notwithstanding the above, TDAs are not prohibited from being transferred due to circumstances arising from death, incompetence, marriage, divorce, attachment or otherwise by operation of law.

2.12   **Security Interest.** You grant us, to the extent allowed by law, a continuing security interest in your Account (except IRA Accounts) and its proceeds, and any of your funds or property in our possession, to secure present and future indebtedness any Owner of the Account owes us.

2.14   **Set Off.** You agree that we may, at any time and without prior notice, set off funds in any Account, or any other funds or property in our possession, in which you have an ownership interest for the payment of debts or liabilities, including loans, owed to us by any or all of you, to the fullest extent permitted by law and regardless of the source of the funds in your Account. You understand such action could result in an interest penalty or dishonor of subsequent debits. Our right of Set Off does not apply to Personal Accounts if the obligation is created under a consumer credit card plan, IRAs or ESAs.

2.15   **Posting Order.** We determine the order checks, transfers and other transactions are posted to and paid from the funds in your Checking or Savings Account and reserve the right to post and pay checks, transfers and other transactions in any order. However, our usual posting order for ordinary transactions is as follows:

  1. All credits, including but not limited to checks that you deposit into your Checking or Savings Account, wire transfer deposits, ACH direct deposits, ATM deposits and cash deposits, posted in high to low order without regard to transaction type.

  2. Error resolution debit entries. These entries correct or reverse prior credits that we gave in error to your Checking or Savings Account, posted in high to low order.

  3. Fees that you owe us, including but not limited to fees for your Checking or Savings Account, paid in high to low order.

  4. Wire transfer debits, paid in high to low order.

  5. ATM, Check Card and customer initiated electronic and IVR (interactive voice response) telephone transfers between Comerica Bank Checking or Savings Accounts. If we know when the transactions occurred, we pay them in chronological order. If we do not know when the transactions occurred, we pay in low to high order.

  6. All other debit transactions not described in 2-5 immediately above, including but not limited to checks, on line bill payments, teller withdrawals and in person/telephone (non-IVR) transfers, paid in high to low order without regard to transaction type.

2.16   **Deposits.** A minimum deposit may be required to open and/or add to an Account. Refer to the APY Disclosure and Brochure for any minimum balance requirements. We reserve the right to limit the size of a deposit and the amount of funds maintained in an Account. If you have a Card (ATM, Comerica Check Card or Comerica Business Check Card) associated with your Account, you may make ATM deposits only at Comerica Bank ATMs.

If you deposit funds belonging to third parties (beneficial owners) in an analyzed Account, you represent that your use of any related earnings credit will not violate any law, regulation, obligation, or agreement with such parties. You also agree to indemnify and hold us harmless from and against any and all claims, actions, proceedings, losses, costs (including attorney's fees and other charges), liabilities and/or damages that arise from your use of the analysis service or the manner in which you compensate or charge beneficial owners for your use of our services. This provision shall survive the termination of the Contract.

We may accept from any source, an item payable to any Owner for deposit to your Account without questioning the authority of the person to make the deposit and whether or not it is endorsed by us. On Personal Accounts, you authorize us to give cash back to any Authorized Signer or designated agent on any check payable to any Owner.

We may refuse to accept an item for deposit or may accept an item on a collection basis only. Deposits of Comerica Cashier's checks, Teller checks, Official Checks, On-us checks (check drawn on Comerica Bank), Certified checks, Federal Reserve Bank checks, Federal Home Loan Bank checks, state or local government checks (if deposited in the issuing state), U.S. Treasury checks, and Travelers Cheques, must be deposited with a teller at a Comerica Bank banking center to receive next day funds availability. Deposits dropped off by couriers, where we accept such deposits, must be enclosed in bags that we determine are acceptable for this purpose and contain a completed deposit ticket. Any item we cash or accept for deposit is subject to verification and final payment. We may deduct funds from your Account if an item is lost, stolen, or destroyed in the collection process, or if it is returned to us unpaid, even if you have already used the funds. In the alternative, we may re-present the item for payment. In addition, see Section 7.34 regarding electronic credits.

We may issue a deposit receipt based upon the amount written on your deposit ticket without verifying the cash and checks included with the deposit. However, you are bound by our final count of such deposits.

You should include a completed deposit ticket for each deposit, except those made at an ATM or by other electronic means. If you make any deposit or payment which is not accompanied by instructions indicating how or where it is to be credited, we may apply it, at our discretion, to any loan or Account you maintain with us. When you make a deposit at an ATM, we credit an Account linked to your Card (even if you enclosed a deposit slip or instruction for a different Account).

2.16.02 **Endorsements.** You agree to comply with Regulation CC endorsement standards which are printed on the back of most checks. We reserve the right to refuse to accept a check if the back is not clear and readable or otherwise fails to meet these standards. You will be responsible for any loss that we incur as a result of any check returned to us because you or the payee failed to comply with these standards. You authorize us to supply your endorsement on items deposited to your Account by you or on your behalf. If your Account is jointly owned, any Owner may endorse checks payable to any one or more of the other Owners for deposit to your Account. You authorize us to accept for credit to your Account or collection all checks, drafts and funds transfers for payment of money when your instructions indicate to do so or when endorsed in your name using an endorsement method acceptable to us whether or not a title designation accompanies the endorsement or order. If you deposit items that have endorsements of individuals or entities unknown to us, we may refuse the item or require all endorsers to be present or to have their endorsements guaranteed before we accept the item. We may also require noncustomers to provide suitable identification, including a fingerprint, and to pay check cashing fees before cashing checks drawn on your Account.

2.16.04 **Night Depository/Night Drop.** If you use the night depository or night drop ("depository"), please observe the safety instructions described for ATMs in Section 7.32. We cannot guarantee your safety at the depository. All such deposits are subject to later verification, count and adjustment by us and will be deemed received by us when they have been removed from the depository and are accessible to us for processing. We do not insure the depository or its contents. We will not be responsible for any loss caused by fire, flood, water damage, vandalism, burglary or acts of God. If you sign a separate night depository agreement with us, the terms of that agreement will govern your deposits to the depository in the event of any inconsistency with this Contract.

2.16.06 **Items Sent for Collection.** We and other institutions may refuse to accept a check for deposit or may accept it on a collection basis only. This often occurs with foreign, questionable or damaged checks. If we accept an item for collection, we will send it to the institution upon which it is drawn, but will not credit your Account for the amount until we receive the funds from the other institution. If we elect to credit your Account before then, we may charge the amount back against your Account if we do not receive payment for any reason. We may impose a fee in connection with sending and receiving checks for collection. Other institutions that send or receive checks for collection involving your Account also may impose a fee for their services. If we accept a foreign check, you assume all the risk of loss associated with currency value fluctuations and late returns. We may use our current buying or selling rate, as applicable, when processing foreign currency items and may recover from your Account any loss incurred in connection with our processing of such items.

2.16.08 **Demand Drafts.** You may not deposit demand drafts (items not bearing the maker's signature, but purporting to be authorized by the maker) to an Account with us without our prior, express written consent. If you make such a deposit you are liable for any loss or cost we incur as a result.

2.18 **Checks.** We may refuse to accept or charge an additional fee for any checks you have written or that you deposit that cannot be legibly imaged or copied, are not in machine readable form or cannot be electronically processed. If you do not order your checks through us, we may require samples of your checks and deposit tickets. You agree to safeguard your blank checks and to take reasonable steps to prevent their unauthorized use. You agree to notify us immediately if it appears that any blank checks are missing or otherwise unaccounted for, or if you become aware of the use of counterfeit checks purportedly drawn on your Account. Further, to the extent that we have exercised ordinary care in paying or taking the checks, you agree to accept responsibility for any failure to safeguard your blank checks. We may require you to close your Account and/or accept a new Account if one or more of your blank checks are lost or stolen or if there has been unauthorized use of your Account. You agree that we will be free from any liability if we return such checks "Account Closed", and that we will not be liable for the cost of any unused checks on such an Account.

2.18.02 **Checks Bearing Notations.** We may pay or accept checks and other items bearing restrictions or notations (i.e., "Void after six months," "Void over $25," "Payment in Full," ) whether written on the front or the back in any form or format. If you write, cash or deposit a check with such notations, you agree that any such restrictions or notations apply only between you and the payee or maker. The notation will not bind us and you agree to accept responsibility for the payment of the item. You agree to indemnify and hold us harmless from and against any claim or alleged loss of any payee or maker involving such notations if the funds are deposited into your Account or you are the maker or payee.

2.18.04 **Postdated Checks.** We may pay or return a check, at our discretion, if it is presented prior to the date stated on the check. You may request that we not pay the check prior to its stated date by placing a stop payment on the check. (See Section 2.18.10 for stop payment requirements and timing rules.)

2.18.06 **Stale-Dated Checks.** We may pay or reject a check which is presented for payment more than six months after its stated date, even if the presentation occurs after the expiration of a stop payment order or written notice of a postdated check. We are not required to identify or to seek your permission to pay stale-dated checks.

2.18.07 **Checks Written For More Than $99,999,999.99.** You agree that you will not write checks in an amount that exceeds $99,999,999.99. If you do, however, write a check that exceeds this amount, you assume all risk of loss due to improper processing which may occur due to industry system limitations.

2.18.08 **Words vs. Numbers.** You agree that we may process checks based on either the written or numerical amount reflected on the items. If we note a contradiction between the numerical and written amounts, or if the numerical amount is missing, we may treat the amount contained in the words portion of the check as prevailing.

2.18.10 **Stop Payments.** Payment may be stopped on a check if you give us a reasonable period of time to act on your notice and we have not already paid the check. Even if we have not paid the check, we will not be bound by a stop payment request made later than one hour after the opening of the Business Day following the Business Day on which the check is presented to us for payment. A notice to stop payment must include all of the following:

- Your Account number,

- The check number,

- The **EXACT AMOUNT (dollars and cents)** of the check,

- (At our discretion) the name of the payee and check date.

We will not be liable for paying a check over a stop payment order if the order is incomplete, incorrect, has expired or was not received in a timely manner. Further, we will not be liable for making payment contrary to your stop payment request if payment is made through inadvertence or accident notwithstanding our use of ordinary care.

We will be bound by an oral stop payment order for 14 days, although in our sole discretion, we may continue to honor an oral stop payment order for six months. We will be bound by an order that is written or communicated to us by IVR/VoiceBank for six months unless you renew or revoke it in writing.

You will indemnify us for all costs, expenses, damages and attorney's fees we incurred due to refusal to pay the item on which you requested a stop payment.

If we credit your Account for the amount of loss you prove has occurred after having paid your check over a correct and timely stop payment order, you assign to us all rights against the payee and/or any other holder of your check and agree to cooperate with us in any legal actions that we may take against such persons or entities.

Stop payment orders on electronic items are subject to other rules and/or agreements; see Section 7.08 with respect to Personal Accounts.

2.18.12   **Check Verification.** We may process checks via an automated system based on the information encoded on the items. We do not visually examine each check to determine if it is properly completed or endorsed, and we assume no duty to identify and/or return duplicate checks, checks with duplicate serial numbers, misencoded items, or checks lacking an encoded serial number. While we review checks from time to time, you understand and agree that reasonable commercial standards do not require it.

2.18.13   **CHECK CLEARING FOR THE 21st CENTURY ACT ("CHECK 21") and YOUR RIGHTS. Important Information for Consumers About Your Checking Account, Substitute Checks and Your Consumer Rights.**

What is a Substitute Check? To make check processing faster, federal law permits banks to replace original checks with "Substitute Checks." These checks are similar in size to original checks with a slightly reduced image of the front and back of the original check. The front of a Substitute Check states: "This is a legal copy of your check. You can use it the same way you would use the original check." You may use a Substitute Check as proof of payment just like the original check.

Some or all of the checks that you receive back from us may be Substitute Checks. This section describes rights you have when you receive Substitute Checks from us. The rights in this section do not apply to original checks or to electronic debits to your account. However, you have rights under other laws with respect to those transactions.

What are my rights regarding Substitute Checks? In certain cases, federal law provides a special procedure that allows you to request a refund for losses you suffer if a Substitute Check is posted to your Account (for example, if you think that we withdrew the wrong amount from your account or that we withdrew money from your account more than once for the same check). The losses you may attempt to recover under this procedure may include the amount that was withdrawn from your Account and fees that were charged as a direct result of this withdrawal (for example, bounced check fees).

The amount of your refund under this procedure is limited to the amount of your loss or the amount of the Substitute Check, whichever is less. If your Account is interest bearing, you are also entitled to interest on the amount of your refund. If your loss exceeds the amount of the Substitute Check, you may be able to recover additional amounts under other laws.

If you use this procedure, you may receive up to $2,500 of your refund (plus interest if your account earns interest) within 10 business days after we received your claim and the remainder of your refund (plus interest, if applicable) not later than 45 calendar days after we received your claim. We may reverse the refund (including any interest on the refund) if we later are able to demonstrate that the Substitute Check in question was correctly posted to your Account.

How do I make a claim for a refund? If you believe that you have suffered a loss relating to a Substitute Check that you received and that was posted to your Account, **please go to a Comerica banking center or phone us at 800.854.4456 to make your claim.** You must contact us within 40 calendar days of the date that we mailed or otherwise delivered or made available (per your agreement) the Substitute Check in question or the Account statement showing that the Substitute Check was posted to your Account, whichever is later. We will extend this time period if you were not able to make a timely claim because of extraordinary circumstances. Your claim must include all of the following:

- A description of why you have suffered a loss (for example you think the amount withdrawn was incorrect or the original check was not authorized by you);

- An estimate of the amount of your loss;

- An explanation of why the Substitute Check you received is insufficient to confirm that you suffered a loss; and

- A copy of the Substitute Check or if you cannot provide a copy, the following information to help us identify the Substitute Check in question: the check number, the name of the person to whom the check is written, the amount of the check and the date that it was debited from your Account.

If you make your claim by phoning us and your claim alleges forgery, alteration or fraud regarding a Substitute Check, we require you to put your claim in writing and complete and sign an affidavit of forgery/fraud. We must receive your written claim by the 10th banking day after the banking day on which we received your oral claim. You may make your written claim at a banking center, mail it on an address we give you or mail it to:

> Comerica Bank
> P.O. Box 5000
> Detroit, MI 48275-2320

If you do not require a better copy of the Substitute Check to confirm that you in fact suffered a loss, the special procedure described above does not apply but you may have other rights. See Section 2.24.02 regarding your obligations and rights and call us at the phone number above or go to your banking center to make your claim.

2.18.14   **Check Cashing (Non-Account holder, check drawn on Comerica Bank).** When a check you have written is presented at one of our banking centers for cashing by a payee/presenter who is not an Account Owner, you agree that we may charge the payee/presenter a check cashing fee unless we have agreed in writing otherwise. You agree that our refusal to cash your check without receipt of payment of the check cashing fee will not constitute wrongful dishonor of the check. For purposes of this fee, generally a non-Account Owner is a person or entity that does not have an open Account or loan with us when cashing or attempting to cash a check. You also agree that we have the right to change our definition of an Account Owner at any time and no prior notice of such change is required.

2.18.16   **Payable Through Drafts.** You agree not to execute any draft "payable through" us unless we have signed a written agreement with you governing handling of payable through drafts. If we do not have an agreement governing the handling of drafts, we may dishonor any "payable through" draft drawn by you without notice to you and charge your Account our customary returned check charge. If any draft indicates your Account number (in MICR encoding or otherwise), we may treat that item as a check drawn on the indicated Account.

2.18.20   **Electronic Check Representment (RCK).** If we receive an electronic represented check (RCK), we will pay or return the RCK as if the check was again presented to us for payment in accordance with the NACHA rules.

2.20   **Withdrawals.** Some Accounts may be accessed through Comerica ATMs, merchant terminals and participating ATM networks. Some Accounts may also be accessed by checks or by other means.

If a photocopy of a check or other item that appears to be drawn on your Account is presented to us for payment in place of the original, we may pay the photocopy if it is accompanied by a representation from another financial institution that the original item has been lost or destroyed. We will not be liable if the original item is later presented to and paid by us, unless a stop payment order is in effect for the check.

For IRA Account withdrawals, tax reporting rules require that you give us the reason for withdrawal.

2.20.02   **Authorized Signature.** We may pay out, transfer or withdraw any and all funds in your Account, when authorized by any Authorized Signer, whether the request is in writing (original or Simulated Signature), by telephone, or other means which we determine acceptable. You authorize us to pay any and all such checks, drafts, orders, transfers, wire instructions or other instruments, even if to do so creates an Overdraft in your Account. We are not required to inquire into the circumstance of your checks, withdrawals or transfers or the disposition of the proceeds of them, whether: (a) drawn to the individual order; (b) tendered in payment of an individual obligation; (c) deposited or transferred to the personal accounts of the Authorized Signer; or (d) otherwise ordering the transfer or withdrawal from any Account. We reserve the right, at any time, to refuse to accept Simulated Signatures. If you use a Simulated Signature, you agree to indemnify and hold us harmless from and against any and all losses, claims, damages, liability, costs and expenses (including reasonable attorney's fees) you incur arising out of the use, misuse or unauthorized use of a Simulated Signature by any person. You agree to assume any and all responsibility for any and all payments we make in good faith reliance upon Simulated Signatures resembling an Authorized Signature which you have provided to us.

2.20.04  **Withdrawals by Legal Representative.** Unless required by law, we will not be obligated, but may permit, your attorney-in-fact, agent or other legal representative to make withdrawals from your Account provided that the documentation we receive is acceptable to us. Except as required by law, we will have no liability to you, your heirs or assigns for making such payments if we reasonably believe the documentation provided to us is valid or if we refuse, in our sole and absolute discretion, to make such payments. Each Owner consents to the withdrawals made by any other Account Owner's attorney-in-fact/agent or other legal representative.

2.20.06  **Withdrawal Limitations and Penalties**

a. Notice of Withdrawal. We reserve the right to require seven days' notice of any withdrawal or transfer of funds from any Account, other than an Account that is an interest-bearing Business Checking Account, or an Account as to which the reservation of such right would preclude the Account from qualifying for the unlimited guarantee of the FDIC under the FDIC's temporary unlimited coverage for noninterest-bearing transaction Accounts.

b. Savings Accounts. Federal regulation requires us to monitor your compliance with withdrawal limitations. Under federal law, you may make no more than six transfers or withdrawals by means of pre-authorized, electronic/automatic, telephone transfers or withdrawals, or by check, draft, debit card or similar order made by you and payable to third parties per statement cycle. Transfers subject to these limitations include automatic deductions set up with third parties and Automatic Overdraft Protection transfers. We count these transfers and transactions as of the date we post them to your Account, not as of the date you write or authorize them.

These transaction limits do not apply to withdrawals made in person, by mail, or by ATM, and do not apply to transfers to pay loans with us. If you continue to violate withdrawal limits after we have contacted you, we may reclassify or close your Account at our option. Except for distributions, no preauthorized, electronic or telephone transfers or withdrawals may be made from IRA or ESA Savings Accounts.

c. TDAs (including IRA and ESA TDAs). We may refuse to permit any withdrawal from a TDA prior to maturity except: (1) upon the death of any Owner; or (2) when the Owner is determined to be legally incompetent.

If we permit you to make a withdrawal from, or to renegotiate the terms of, a TDA prior to maturity, you agree to pay the applicable early withdrawal penalty, except in the circumstances described in (1) and (2) above. Interest paid on your TDA is available for withdrawal without penalty, unless it has been added to, and has become a part of, the principal amount. Upon automatic renewal, interest that has become part of principal will be subject to the early withdrawal penalties described below.

The early withdrawal penalty consists of the amount of interest that was, or could have been but for the early withdrawal, earned on the principal balance over a specified period of time. For variable rate TDAs, the penalty is calculated based on the rate in effect on the day of withdrawal.

For fixed rate TDAs the early withdrawal penalty is one month's interest for TDAs with a term of less than 90 days, three months' interest for terms of 90 - 179 days and six months' interest for terms of 180 days or longer.

TDAs with a variable rate are subject to an early withdrawal penalty equal to three months' interest. You may take a one-time withdrawal of up to 50% of the Account balance (principal and paid interest) any time after 7 days of opening the Account or additional deposit, but before maturity without incurring a Bank penalty.

d. Rules Applicable to IRAs and ESAs. In addition, special rules apply to early withdrawals from IRAs and ESAs. There is no early withdrawal penalty imposed if you withdraw your deposit within seven days after the date your IRA or ESA plan is established, except you will forfeit an amount equal to the simple interest earned on the amount withdrawn. We will not assess a penalty in the following additional circumstances:

1. you transfer deposit(s) during the 10-day grace period from one IRA or ESA to another IRA or ESA. Such withdrawals are considered to be made on the maturity date and if any interest is paid during the ten (10) day grace period it may be paid at a reduced rate, as Bank determines from time to time;

2. you make a withdrawal of a specified deposit within the ten (10) day grace period;

3. your death or permanent disability;

4. your withdrawal of a deposit is pursuant to a court order;

5. your withdrawal is part of a mandatory scheduled distribution;

6. your IRA withdrawal is used for qualified first time home buyer expenses (refer to the Disclosure Statement and Master Terms of IRA Custodial Accounts);

7. your IRA withdrawal is used for qualified higher education expenses (refer to the Disclosure Statement and Master Terms of IRA Custodial Accounts);

8. your IRA withdrawal is used for qualified medical or health insurance expenses (refer to the Disclosure Statement and Master Terms of IRA Custodial Accounts);

9. your ESA withdrawal is used for the qualified primary, secondary or higher education expenses for the child Beneficiary (refer to the Disclosure Statement and Master Terms of IRA Custodial Accounts); or

10. to correct an excess IRA or ESA contribution before the due date of your tax return.

Subject to the exceptions noted above, the early withdrawal penalties described in subsection (c) above also apply to IRA and ESA TDAs. The penalties apply regardless of the time the funds withdrawn have remained on deposit.

If you transfer your IRA or ESA, in whole or in part, directly to another financial institution (not as part of a scheduled distribution) the early withdrawal penalties described above and the Service Charge stated in the Brochure will be applicable. EARLY WITHDRAWAL PENALTIES MAY REDUCE YOUR PRINCIPAL BALANCE.

2.20.08  **Funds Transfers/ACH Transactions (Outgoing).** If you do not execute a Bank Funds Transfer Agreement or ACH Agreement, we may, at our discretion, accept a written or oral funds transfer order from an Authorized Signer. If we do, you agree that our understanding of the instructions and our records will be conclusive evidence of the actual instructions given. We may handle funds transfer requests in any order we select. Any funds transfer request we receive on a non-Funds Transfer Business Day may be treated as accepted by us at the opening of the next Funds Transfer Business Day. We may presume that no financial institution to which or through which a funds transfer is sent has an earlier cutoff time for accepting transfers than we do. We may use any means which we, in our sole discretion, consider suitable for the transferring of funds. See Section 7.34 for additional terms applicable to outgoing funds transfers.

2.20.10  **Withdrawals/Transfers by Telephone or Electronic Order.** We may, in our sole discretion, accept and act on telephonic or electronic instructions from an Authorized Signer. You agree that our understanding of instructions and our records will be conclusive evidence of the actual instructions given. Unless otherwise agreed in writing, we are not required to accept instructions or permit withdrawals by telephone, and this does not constitute an agreement to do so. See Section 7.02.02 concerning Telephone Banking Services, which may be available to you if you have a PIN and/or Card and a touch-tone telephone.

The number of telephone transfers or withdrawals you may make in each billing cycle may be limited based upon the type of Account. We are not obligated to act on any telephone or electronic instruction that violates such restrictions or if we believe, whether correctly or incorrectly, that the caller may not be an Authorized Signer.

Your ability to give us telephonic or electronic instructions may be subject to the terms of additional agreement(s) you will be required to execute before such access is permitted.

2.20.11  **Automated Transfers Between Bank Checking Accounts (Business Accounts).** If you elect this service, at the close of each Business Day but before the opening of the next Business Day, we will transfer funds from your selected sub-Account to your master Account, after paying all items or other transfers/debits drawn on or against the sub-Account. To the extent that your selected sub-Account has a negative balance, we will transfer funds from your selected master Account to the sub-Account in an amount sufficient to bring the balance in the sub-Account to zero (or other target balance you select). If at any time you have insufficient balances in your

selected master Account or sub-Account to accomplish the transfers, we will have no duty or obligation to transfer any amount provided however, at our option we may transfer such amounts necessary between the Accounts to bring the balance in the sub- Account to zero.

At our option, we may honor your oral instructions regarding these transfers and you agree that we may in good faith rely on any such oral instructions which purport to come from an Authorized Signer without independent verification.

2.20.12   **Debiting Your Account.** You agree that unless you have a sufficient Available Balance in your Account when an Authorized Signer issues a check, instrument, or other order that will result in a debit to your Account, we may reject the transaction. You also agree that we may present or receive presentment of an item by electronic presentment notice or by presentment of the actual item.

We may debit your Account on the day a demand for acceptance or payment is made by electronic or other means, whether or not such a notice constitutes presentment pursuant to Regulation CC, the UCC or applicable clearinghouse rules. In addition, we may debit or place a hold on funds in your Account if we receive notice that a check or other item deposited to your Account is being returned, or if we receive notice that your check or electronic payment is being processed for collection. We process such demands throughout the night. You agree that if we receive a notice or demand for payment at any point after the close of business but prior to the opening of business on the next Business Day, we may debit your Account for the item as of the prior Business Day.

If you voluntarily give out your Account number or your MICR information to a third person by telephone or otherwise, you agree that this act authorizes us to honor debits to your Account initiated by the recipient of the information, even if a particular transaction initiated by the third party was not authorized.

2.20.14   **Non-Sufficient Funds (sometimes referred to as Insufficient Funds) and Overdrafts.** If you issue checks or electronic funds transfer orders, or otherwise withdraw or transfer funds in an amount that exceeds the Available Balance in your Account, we may, in our sole discretion, pay the item or order and overdraw your Account or reject the instruction and return the item unpaid.

For purchases made with a Card, we place a temporary hold on your Account in an amount equal to the merchant payment authorization that we received through the payment authorization system. In certain circumstances, the payment authorization system permits the merchant to request an authorization for more or less than the final amount of the transaction. A payment authorization tells the merchant whether your Card account has enough money or availability to cover, for example, the gas you are about to pump, a restaurant tab plus potential tip, delivery fees on mail orders, or extra hotel services that you might incur. These authorizations may affect your Available Balance until the final amount of the transaction is received or the transaction is cancelled, which could take three (3) Business Days or more.

If your Account is overdrawn, you agree to pay us the amount of the Overdraft immediately, without notice or demand from us. Unless we otherwise agree in writing, you authorize us, in our sole discretion, to transfer funds from any one of your Accounts to any other of your Accounts to cover an Overdraft. Our payment of any checks, transfers, Card transactions, or withdrawals or other transactions which exceed the Available Balance in your Account in no way obligates us to continue the practice at a later time. We may discontinue this practice at any time without notice to you unless we have agreed otherwise.

We will not be liable for returning items without payment or refusing to transfer funds if at any time the imposition of Service Charges has resulted in an insufficient Available Balance in the Account, unless we have otherwise agreed in writing.

2.20.16   **Dishonor of Items for Protection of Your Account.** To help protect us against fraud, we maintain systems intended to alert us as to possible

fraudulent activities related to your Account. You agree that we will not be liable to you for wrongful dishonor of your check or other payment, even if it was legitimate and intended to be paid, if our refusal to pay was a result of a reasonable belief that it was issued or delivered under possibly fraudulent circumstances or the item was presented for cashing by someone other than the original payee.

2.20.18   **Cashing Checks and Cash Withdrawals.** If a large amount of cash is requested, we reserve the right to limit the amount if we do not have sufficient cash on hand. In such a case, we may make arrangements for later cash payment or offer to make payment with a Bank check. We do not recommend nor do we assume responsibility for persons carrying large sums of currency and we may require that you sign a waiver of our liability before taking possession of large amounts of cash.

**Cashing Checks for Others.** You should not use your Account to cash checks payable to others who are not well known to you. Although we may make funds available to you based upon your deposit of the check or cashing of the check and may take steps to determine whether a check you presented to us for deposit or cashing will be paid, our employees cannot promise that a check, including cashier and certified check, will be finally paid by the bank on which it is drawn. We may, at our discretion also require you and each payee to endorse the check in our presence and provide proof of identity. If we accept the check for deposit or cashing, and the check you deposit or cashed is returned unpaid to us for any reason (e.g., because it is counterfeit or altered) and even if it is returned to us by the bank on which it appeared to be drawn after the time period generally allowed by law for the return of the check, you are solely responsible for the loss and we will debit your account for the amount of credit and/or cash we previously gave you representing the check, even if it will cause your Account to be overdrawn. If you do not have sufficient available balances to cover the loss, we may make demand on you by telephone or in writing for payment and you agree to pay us within one Business Day of our demand. In some cases, a check may be returned unpaid up to a year later.

2.20.20   **Cutoff Hour.** If we receive an item for payment on a weekend, a holiday, or after 2:00 p.m. local time on a Business Day, we may treat it as if we had received it on the next Business Day.

2.22   **Waiver of Protest, Dishonor, Non-Payment.** To the maximum extent permitted by law, you waive protest for and notice of the dishonor and/or nonpayment of any items deposited. We will not release your liability as an endorser merely by obtaining verification of any check deposited or cashed.

2.24   **Account Statements.** We will maintain a record of your Account and the transactions relating to it. Unless otherwise agreed or we receive returned mail addressed to you, we will periodically send Account statements and notices to your address listed in our records. If you would like a copy of your statements or notices, we will provide copies to you within a reasonable time after you request them and pay any applicable Service Charges. Statements and notices sent or made available to any one Owner are deemed to be received by all Owners. If we hold them at your request or because you fail to provide us with a current address, they will be deemed delivered to you when they are prepared, mailed or otherwise made available to you.

2.24.02   **Review of Statements and Notices.** You are in the best position to discover and report any discrepancies including unauthorized debits to your Account. You agree to notify us immediately of any error, discrepancy or unauthorized transaction you discover on any statement, notice or check we provide to you. If you fail to do so, you may become responsible for the losses resulting from such failure. You are responsible for monitoring and reviewing the activity of your Account and, if applicable, the work of your employees, agents, and accountants. Toward that end, Business Account Owners should have at least two individuals inspect statements on a regular basis to look for improper and unauthorized signatures, alterations, forged endorsements, overpayments, or any other irregularities, and to ensure that the Accounts are being handled in a proper manner. We may deny any claim for loss due to forged or unauthorized checks if you fail to follow these procedures.

If you discover an error, forgery, alteration or any other unauthorized activity involving your Account, you must notify us at the telephone number

8

or address provided on your Account statement. You can also notify us in person at one of our banking centers. You agree to provide us with a written statement of the relevant facts, including a description of the transaction or error, and the identity of any suspected wrongdoers. If you fail to notify us within a reasonable time (not to exceed 30 days from the date you discover the problem or have access to a statement or notice reflecting the transaction, whichever occurs first), we will not be responsible for subsequent unauthorized transactions to any of your accounts by the same wrongdoer. Without regard to care or lack of care of either you or us, if you do not discover and report the error, forgery, alteration or other unauthorized transaction within 60 days after the date of your statement or the date the information about the item or transaction is made available to you, whichever is earlier, you are precluded from asserting the error or unauthorized transaction against us. Note: Different notification and liability rules apply to certain electronic funds transfers (See Section 7, below).

If you claim a credit or refund because of an unauthorized transaction, you agree to provide us with a declaration containing whatever reasonable information we require regarding your Account, the transaction and the circumstances surrounding the claimed loss. You also agree to make a report to the police and to provide us with a copy of the report, upon request. We will have a reasonable period of time to investigate the circumstances surrounding any claimed loss. During our investigation, we will have no obligation to provisionally credit your Account, unless otherwise required by law (e.g., in connection with certain consumer electronic fund transfer services).

Unless the law requires otherwise, our maximum liability to you will never exceed the amount of actual damages proven by you. Our liability will be reduced: (a) by the amount of the loss that is caused by your own negligence or lack of care; (b) to the extent that damages could not have been avoided by our exercise of ordinary care; and (c) by any loss recovery that you obtain from third parties (apportioned in accordance with this provision). We will not be liable for any loss that is caused in part by your negligence if we acted with ordinary care. Unless otherwise required by law, we will not be liable for incidental, special or consequential damages, including loss of profits and/or opportunity, or for attorney's fees incurred by you, even if we were aware of the possibility of such damages.

You agree to pursue all rights you may have under any insurance policy you maintain in connection with any loss associated with your account and to provide us with information regarding coverage. Our liability will be reduced, proportionately in accordance with our responsibility for any loss, by the amount of any insurance proceeds you receive or are entitled to receive for the loss. If we reimburse you for a loss and the loss is covered by insurance, you agree to assign us your rights under the insurance policy to the extent of our reimbursement, in accordance with this provision.

At your request, we will provide you with copies of your paper transactions. However, your request for such items will not extend the time within which you must notify us of the discrepancies shown on your Account statement. We will keep records of your transactions for five years unless the law requires us to retain them for a longer period of time.

2.24.04   **CheckPhoto.** If we make this service available to you, we will destroy your checks, although copies will be made available pursuant to Section 2.24.02. You agree that the check images provided with your Account statement, along with the availability of reproductions of checks, are sufficient for you to determine if forgeries or alterations have occurred.

2.24.06   **Check Safekeeping.** If we make this service available to you, we will destroy your checks, although copies will be made available pursuant to Section 2.24.02. You agree that the availability of copies of checks, and the description of the posting date, item number and amount of each paid item that we include on your statement is sufficient for you to determine if forgeries or alterations have occurred.

2.26   **Payment of Interest for Accounts that Earn Interest.**

1. Interest Rates. For Accounts that earn interest, our current interest rates and corresponding Annual Percentage Yield (APY) for Personal Accounts are disclosed on the APY Disclosure we provide in person or by mail, as permitted by law or regulation, on the day of Account opening and CD

Account renegotiation. For Business Accounts we will provide you the interest rate and at our option the APY for your Account at Account opening and CD Account renegotiation. Our current rates are available by telephone and at our banking centers.

2. Accruing Interest. Interest for CDs (including IRA CDs and ESA CDs) begins to accrue on the Business Day of the deposit. For all other interest-bearing Accounts not described above, interest begins to accrue on the Business Day of deposit for cash items and no later than the Business Day we receive credit for the deposit of non-cash items (for example, checks). Once interest begins to accrue, it will accrue for the number of days your funds are on deposit excluding the day of withdrawal.

3. Interest Calculation Method. We use the daily balance method to calculate the interest you earn on your Account. This method applies a daily periodic rate to the balance (Ledger Balance or Collected Balance, as applicable for the Account) in your Account each day. For tiered rate Accounts, at the end of each day we determine your balance and we apply the interest rate applicable to that balance tier for that day.

2.28   **Service Charges.** Service Charges are disclosed in the Brochure applicable to your Account's region/market and are subject to change from time to time. You agree to pay the Service Charges and authorize us, subject to applicable law, to deduct them from your Account unless we agree to another payment method. If we are unable to collect the Service Charges, we may deduct the amount owed from any of your other Accounts.

2.30   **Overdraft Protection.** If you request and we approve overdraft protection for your designated Checking Account, we will transfer funds from a designated Overdraft Protection Account to your Checking Account to cover Overdrafts caused by debits including but not limited to withdrawals, transfers, ATM and Check Card transactions, other electronic transactions, and Service Charges, subject to transfer and credit limits described in this Contract, including the Brochure. "Overdraft" is defined in Section 1.46.

The Overdraft Protection Accounts we currently offer are described below, however not all types are available for use in all markets. Transfers from an Overdraft Protection Account to cover the amount of the day's Overdraft will be as follows:

a. Savings Account — An amount necessary, up to the Available Balance in the Savings Account to cover the day's Overdraft.

b. Comerica equity line of credit — A minimum transfer of $50 and additional increments of $10 as necessary, but not to exceed the available credit, to cover the day's Overdraft.

c. Credit Card — A minimum transfer of $100 and additional increments of $100 as necessary, but not to exceed the available credit, to cover the day's Overdraft.

**Regardless of where your Account was opened the following conditions and restrictions also apply:**

**If your use of a Comerica Check or ATM Card exceeds the Available Balance in your linked Checking Account, the maximum amount that will be transferred from the Overdraft Protection Account to cover this overdrawn amount is $500, even if your Available Balance or available credit in your Overdraft Protection Account is more. You will be responsible for reimbursing us for the amount of the Overdraft in your Account.**

**If your Overdraft Protection Account is a Savings Account that does not have a sufficient Available Balance to cover the Overdraft, we may transfer the amount that is available subject to the minimum/incremental requirements and use that amount to pay the Overdraft in the order described in Section 2.15 and return or reflect as unpaid the items for which there are not sufficient funds.**

**If your Overdraft Protection Account is a Credit Card, Comerica equity line of credit or Cash Reserve and you do not have sufficient available credit in the required incremental amounts to cover the entire Overdraft amount, no funds will be transferred from the Overdraft Protection Account. We will pay the items presented against your Checking Account in accordance with Section 2.15 and the remainder may be returned or reflected as unpaid.**

You or we may terminate the overdraft protection service at any time. If you desire to terminate the service, you must provide us with notice in a form acceptable to us. If the Overdraft Protection Account is closed for any reason, this service will be terminated. Your request to terminate the service will become effective within a reasonable time after we receive notice. If we wish to terminate the service we will give you notice of termination as required by law.

To reinstate overdraft protection, any one Owner of the Checking Account and Overdraft Protection Account must make a request in writing and if we approve the request, you will be notified in writing.

Upon termination of overdraft protection, we will not be obligated to notify others of the termination. We will not be responsible for any claim or loss which may arise, either directly or indirectly, from the withdrawal or failure to allow the withdrawal, debit or transfer of funds, or from the refusal of others to accept checks drawn on the Checking Account following termination of this service.

2.32 **Closing the Account.** Either you or we may close your Account, with or without cause, at any time unless we otherwise agree in writing. On closing you will receive the Available Balance, less any amounts you owe us.

2.34 **Special Rules for TDAs.** This section applies to TDAs, Education Savings Accounts (ESA TDAs) and IRA TDAs. Unless otherwise stated, TDAs includes ESA TDAs and IRA TDAs.

    a. Renewals. TDAs will automatically renew at maturity for the same period of time as the initial term unless we notify you otherwise. The renewed TDA is subject to the prevailing Contract terms that are in effect on the renewal date. If we have discontinued the type of TDA you have at the time of renewal, we will substitute the product then offered in its place. Unless specifically stated otherwise, any bonus or special promotion we offer will not apply to renewing TDAs.

    b. Grace Period. There is a grace period after the maturity date during which you may withdraw funds from or close your TDA without penalty. The length of the grace period is 3 days for TDAs with a maturity of less than 30 days and 10 days for all other TDAs. If you withdraw funds from or close your TDA during the grace period, interest will be paid at a reduced rate on the principal amount from the maturity date until the day of withdrawal.

    c. Limits on Additional Deposits to TDAs. You may not make additional deposits to your fixed rate TDA prior to maturity. Additional deposits are allowed during the grace period. You may make additional deposits to your variable rate TDA at any time, subject to the minimum deposit requirements as stated in the APY disclosure.

3.00 **Legal Matters**

3.02 **Legal Proceedings.** We may restrict the use of an Account if the Account is involved in any legal proceeding. If we are required to initiate any legal proceedings to recover losses caused by transactions occurring on your Account, you agree that we are also entitled to recover our actual costs and attorney's fees associated with bringing the legal proceeding as additional damages under this Contract, unless the law governing your Account prohibits such recovery. For purposes of this section, the term "legal proceeding" includes arbitration.

3.04 **Legal Process.** We will comply with any writ of attachment, execution, garnishment, tax levy, restraining order, subpoena, warrant or other legal process which we believe (correctly or incorrectly) to be valid. You agree that we may honor legal process which is served by mail or facsimile transmission, or at any of our offices, even if the law requires personal delivery at a specific office. You agree to indemnify, defend, and hold us harmless from any and all actions, claims, liability, losses, costs (including attorney's fees) and damages associated with our compliance with such process. We may not pay interest on any funds we hold or set aside in response to legal process. If we are not fully reimbursed for our record research, photocopying and handling costs by the party that served the process, we may charge such amounts to your Account in addition to our minimum legal process fee.

3.05 **Freezing Your Accounts, Conflicting Demands/Disputes.** If we determine that a dispute has arisen or there is uncertainty regarding the ownership or control of an Account or its funds or we believe a transaction affecting

the Account may be fraudulent or may violate any law or regulation, or are subject to a court order requiring us to hold the funds, or we are requested by a state or local agency to freeze the account or reject a transaction due to the suspected financial abuse of an elder or dependent adult, you authorize us, at our sole discretion to: (1) freeze the Account and refuse transactions until we receive written proof (in form and substance satisfactory to us) of each person's right and authority over the Account and its funds or a court order authorizing us to release the funds; (2) refuse transactions and return checks, marked "Refer to Maker'" (or similar language); (3) require the signatures of all Authorized Signers for the withdrawal of funds, the closing of an Account, or any change in the Account regardless of the number of Authorized Signers on the Account; (4) request instructions from a court of competent jurisdiction at your expense regarding the Account or transaction; and/or (5) continue to honor checks and other instructions given to us by persons who appear as Authorized Signers according to our records. The existence of the rights set forth above shall not impose an obligation on us to assert such rights or to deny a transaction.

3.06 **Liability.** Except as stated in the Contract or to the extent the law may require otherwise, you agree that we will have no liability whatsoever to you or any third party because of acts, omissions, or policies of any governmental agency, financial institution or other party through which a funds transfer subject to the Contract is effected (whether or not selected by us), including the failure of any such institution, agency or party to account for or pay over the funds transferred. We will not be liable to you and you agree to indemnify and hold us harmless from any liability for our failure to comply with the terms of the Contract because of legal constraint, interruption or failure of transmission and/or communications facilities, war (declared or not), emergencies, labor disputes, fire, Acts of God, natural disasters or any other circumstances beyond our control.

**IN NO EVENT WILL WE BE LIABLE TO YOU FOR ANY LOST PROFITS, CONSEQUENTIAL, SPECIAL, PUNITIVE OR INDIRECT DAMAGES OR LOSSES, EVEN IF WE ARE ADVISED OF THE POSSIBILITY OF SUCH DAMAGES, EXCEPT TO THE EXTENT REQUIRED BY LAW.**

You also agree to indemnify and hold us harmless (including the payments of reasonable attorney's and paralegal fees and other costs) against all liability to third parties arising out of or in connection with the terms, conditions or services provided under the Contract or otherwise pursuant to your instructions.

3.08 **Limitation of Actions.** You acknowledge that the reconstruction of events causing you to sustain damages becomes difficult and may be inaccurate more than one year following the occurrences of such events. Therefore, you agree that any claim, action, suit, arbitration or other proceeding against us for damages resulting in any respect from our acts or omissions must be brought within one year from the date of our alleged act or omission. However, if your Account is with one of our Texas banking centers, the applicable limitations period will be two years and one day.

3.09 **ARBITRATION AND CLASS ACTION PROVISIONS.**

**READ THESE TERMS CAREFULLY:**

- **THE FOLLOWING PROVISONS REQUIRE THAT ANY DISPUTE MAY BE RESOLVED BY BINDING ARBITRATION.**

- **ARBITRATION IS A DISPUTE RESOLUTION PROCESS THAT DOES NOT INVOLVE THE COURTS.**

- **IN ARBITRATION, WE BOTH GIVE UP THE RIGHTS TO JURY TRIALS. IN ARBITRATION, DISPUTES ARE RESOLVED BY ONE OR MORE ARBITRATORS INSTEAD OF A JUDGE OR JURY.**

- **IN ARBITRATION, THERE WILL BE NO RIGHT OR AUTHORITY FOR ANY DISPUTE TO BE BROUGHT, HEARD OR ARBITRATED AS A CLASS, COLLECTIVE OR REPRESENTATIVE ACTION, AND THIS MEANS NEITHER PARTY WILL HAVE THE RIGHT TO PARTICIPATE IN OR BE A REPRESENTATIVE PLAINTIFF IN A CLASS, COLLECTIVE OR REPRESENTATIVE ACTION OR SIMILAR PROCEEDINGS.**

- **ARBITRATION PROCEDURES ARE TYPICALLY MORE SIMPLE AND EFFICIENT THAN COURT PROCEDURES.**

**AGREEMENT TO ARBITRATE, CLASS ACTION WAIVER, and SMALL CLAIMS CASES:**

**By opening an Account, you agree to resolve disputes through binding arbitration. All arbitration proceedings under this Contract shall be administered by one of the administrators identified below pursuant to the Federal Arbitration Act (FAA), 9 U.S.C. §§1-16 and the laws of the State of Texas. To the extent that there is a conflict between this Section 3.09 and a provision of any other agreement governing an Account, product or service between you and Bank, the provisions of this Section 3.09 shall govern to the extent of the conflict.**

If a dispute arises, either you or we may, without the other's consent, elect to resolve the dispute through binding arbitration instead of through a court proceeding. Any dispute (except for a claim challenging the validity or enforceability of this arbitration agreement, including the class action waiver) may be resolved by binding arbitration if either you or we request it. This includes claims and disputes relating to any other Account or agreement you have or had in the past with us.

**What this means is that if either of us elects to arbitrate a dispute, neither of us shall have the right to file a lawsuit or litigate in court the dispute or to have a jury trial regarding the dispute. This also means that the procedures of arbitration will be those of the arbitration association selected by the party initiating the arbitration proceeding, which will generally limit discovery and appeal rights.**

**ARBITRATION MUST BE ON AN INDIVIDUAL BASIS. THIS REQUIRES BOTH OF US TO WAIVE OUR RIGHTS TO FILE, PARTICIPATE IN OR ACT AS A CLASS REPRESENTATIVE IN CLASS ACTION LAWSUITS RELATED TO ANY DISPUTE BETWEEN US. THIS MEANS NEITHER YOU NOR WE MAY JOIN OR CONSOLIDATE CLAIMS IN ARBITRATION BY OR AGAINST OTHER ACCOUNTHOLDERS, LITIGATE IN COURT, OR ARBITRATE ANY CLAIMS AS A REPRESENTATIVE OR MEMBER OF A CLASS OR IN A PRIVATE ATTORNEY GENERAL CAPACITY.**

If you file a lawsuit or other proceeding in small claims court, this arbitration section will not apply and we will not ask an appropriate court to compel arbitration for such a lawsuit or other proceeding so long as the matter remains subject to the jurisdiction of the small claims court and is decided on an individual (non-class, non-representative basis) for which the judge or decider of the small claims case awards only individual (non-class, non-representative basis) relief. If these conditions are not met, we may ask a court to compel arbitration.

**DISPUTES COVERED:**

**What claims are subject to arbitration?**

All claims, demands, disputes, disagreements, or controversies between you and us regarding any Account, product, or service that we offer, deliver, provide, or refuse to offer, deliver or provide to you (collectively, "Claims") are subject to binding arbitration. Claims include, without limitation: (a) matters based on contract or tort law (including intentional torts), fraud, statutory or regulatory provisions, or any other sources of law; (b) Claims brought as counterclaims, cross-claims, third party claims, interpleaders or otherwise; (c) Claims regarding not only your most recent Account but also disputes regarding all prior Accounts with us or any predecessor bank acquired by us; and (d) representative actions, such as a class action lawsuits, private attorney general actions or proceedings, and other representative actions, whether initiated by you or another party, including a co-applicant or authorized user of your Account, an employee, agent, representative, affiliated company, predecessor or successor, heir, assignee, or trustee in bankruptcy, and whether brought by a private party or a governmental entity. Please take note that all Claims are subject to binding arbitration, in an individual (non-class, non-representative) basis, for which the arbitrator may award relief only on an individual (non-class, non-representative) basis. Claims are subject to binding arbitration regardless of the basis of the Claim, or upon any legal principle that the Claim is based or the remedy that either of us has requested.

**How do I make sure all disputes are resolved through arbitration?**

Both of us agree that all questions regarding whether a dispute is a Claim subject to binding arbitration under this Contract shall be resolved by the arbitrator who is bound to interpret and apply these arbitration provisions in the broadest manner possible under the Federal Arbitration Act, 9 U.S.C. §§1-16 (the "FAA").

In addition, we both agree that, at any time, either of us may ask an appropriate court to compel arbitration of any Claim and to stay or dismiss any ongoing litigation of a Claim pending resolution of such Claim through binding arbitration.

To further ensure that all Claims are subject to binding arbitration, we both agree that these arbitration provisions shall survive and endure beyond termination of, or any changes to, your Account, the Account Contract, or your business relationship with us. These arbitration provisions shall also survive the bankruptcy or reorganization of either of us, including the transfer, sale or assignment of your Account, or any amounts owed on your Account, to any other person or entity to the extent allowed by controlling law. If any portion of this Section 3.09 is deemed invalid or unenforceable, or should any federal banking agency, exercising proper legal authority, determine that any portion of this Section 3.09 or promulgate any regulation causing any portion of this Section 3.09 to be unenforceable or contrary to such a regulation, the entire Section 3.09 shall be null and void. No portion of this Section 3.09 may be amended, severed or waived absent a written agreement between you and us.

A final award of the arbitrator is binding, may be subject to judicial review only as permitted by the FAA or other applicable law, and may be enforced in any court of an appropriate jurisdiction.

**THE BINDING ARBITRATION PROCESS:**

**How do either of us start an arbitration proceeding?**

The first thing that a party must do to start an arbitration proceeding is to select an arbitration administrator. Both of us agree to (i) use either the American Arbitration Association ("AAA") or the Judicial Arbitration and Mediation Services, Inc. ("JAMS") as the arbitration administration for all arbitrations pursuant to this Section 3.09; and (ii) be bound by the applicable arbitration rules of the selected arbitration administration for the Claim.

Copies of the current rules of each of the agreed to arbitration administrators, as well as their respective forms and instructions for initiating arbitration, are available directly from such administrators. Their contact information is as follows:

AAA
800.778.7879 (toll-free)
Website: www.adr.org

JAMS
800.352.5267 (toll-free)
Website: www.jamsadr.com

If both AAA and JAMS go out of business or are unable to administer the arbitration, and if we cannot agree on a substitute administrator and set of arbitration rules, in that event, either of us may request that a court appoint a substitute arbitrator and establish arbitration rules.

**Who pays the fees to file the arbitration and for the arbitrator's decision or ruling? What about other costs of the arbitration?**

We both agree that the party filing the arbitration pays the initial filing fee (if we file, we pay; if you file, you pay). If the rules of the arbitration administrator provide for a fee waiver and it is granted, then you will not have to pay the initial filing fee.

We agree that if you paid the initial filing fee and you prevail in the arbitration, we will reimburse you for that initial filing fee.

11

If under the rules of the arbitration administrator there is a hearing, we will pay any fees of the arbitrator and arbitration administrator for the first day of that hearing. All other fees will be allocated as provided by the rules of the arbitration administrator and any applicable law.

We both agree that with respect to all other costs related to the arbitration, including preparation costs, the parties will bear their own costs. This means that each party will bear the expense of the party's own attorneys, experts, and witnesses, and other expenses while preparing for and during arbitration proceedings. If the arbitrator determines that you are the prevailing party, however, you may request the arbitrator award you reasonable attorney fees and reasonable expenses.

**OTHER IMPORTANT DETAILS ABOUT THESE ARBITRATION PROVISIONS:**

Federal law and the governing law specified in your Account Contract will govern these arbitration provisions and, as necessary, the arbitration. If the Account Contract does not specify a governing law, then the governing law shall be federal law and the law of the state of Texas.

Subject to Section 3.08, neither party will lose its rights under these arbitration provisions by delaying any action to enforce them.

If we have assigned a debt you owe us to an unaffiliated third-party, such third-party will not initiate an arbitration proceeding to collect such debt from you unless you assert a Claim against us or our assignee.

To the extent permitted by law, you are liable to us for our legal costs if we refer collection of your Account to an unaffiliated third-party. These costs may include reasonable attorneys' fees, as well as other costs and expenses of any legal action.

We may assign any or all of our rights and obligations under these arbitration provisions to a third party.

For additional information regarding these arbitration provisions, please call us toll-free at the Customer Service telephone number shown on your Account or billing statement.

3.10   **Jury Trial Waiver/Judicial Reference Proceeding. You and the Bank each waives all right to trial by jury in any dispute regarding your Account and related services. You understand that without this jury trial waiver, your agreement to arbitrate all Claims pursuant to Section 3.09, or your agreement to submit certain disputes for resolution by a judicial reference proceeding (described below), you may have a right to a jury trial on such matters, but you nevertheless agree voluntarily to waive that right. You agree that you have brought this provision to the attention of your legal counsel or you have had the opportunity to do so.**

**Judicial Reference. If under the terms of this Contract, your Account is subject to California law, and if (i) neither you nor we elect to resolve a Claim through binding arbitration or (ii) a court fails or refuses to enforce our agreement to arbitrate, then any Claim regarding your Account and related services will be resolved by a reference proceeding in California in accordance with the provisions of Sections 638, et seq. of the California Code of Civil Procedure, or their successor sections, which shall constitute the exclusive remedy for the resolution of any Claim, including whether the Claim is subject to the reference proceeding. This means that the dispute will be resolved by trial before a court-appointed referee and not by a jury trial.**

3.12   **Release of Information.** Our collection and use of your information is detailed in our Privacy Notice. Generally, we will disclose information to third parties about your Personal Account and the transfers you make if it is necessary or helpful to complete transfers, to verify the existence or condition of your Personal Account for a third party, such as a credit bureau or merchant, to provide you with service you requested, to provide you with information about our products and services and those of our affiliates and joint marketing partners, to comply with government agency or court orders, as required by law, if we believe a crime has been committed involving you or your Account, and/or if you give us your written permission. For Business Accounts and Business Account Owners (non-consumers), we reserve the right to share any information about you and your Accounts: (a) if we determine it is necessary or helpful to complete your transactions or to provide you with service, (b) to verify the existence or condition of your Business Account for a third party, (c) to comply with all federal and state laws and regulations, subpoenas,

court and administrative orders, (d) in response to trade inquiries, (e) if we believe a crime is or has been committed involving you or your Account, (f) to our parent company, affiliates and subsidiaries and/or (g) if you give us your written permission.

3.14   **Power of Attorney.** Except where otherwise required by law, we reserve the right, with or without cause, to refuse to accept any Power of Attorney presented to us by you or your attorney-in-fact/ agent. If we accept your Power of Attorney, we may rely on it until: (a) you provide written (unless we agree to accept oral) notice to us that you have revoked the Power of Attorney; or (b) by law, the Power of Attorney is revoked, and we have received actual notice of the revocation. You agree that we may act on the instructions of your attorney-in-fact/agent whether or not the attorney-in-fact/agent relationship is noted in the instructions given by the attorney-in-fact/agent.

If the Account is jointly owned, we may rely on a Power of Attorney given by any Owner without further consent of the other Owner(s). Unless otherwise stated in the Power of Attorney, you authorize us to give the attorney-in-fact/ agent access to Account information and use of the funds in the Account to the same extent the Owner who granted the Power of Attorney has under this Contract, including, but not limited to, the right to withdraw funds and to close the Account.

3.16   **Dormant Accounts.** We are required by state law to pay to the State the balance in all Accounts that have no deposit or withdrawal activity or Owner contact with us during the period prescribed by law. You agree that we are not liable for any loss you may incur due to our good faith compliance with these laws, and you agree to pay any Dormant Account Service Charges described in the Brochure, unless such a fee is prohibited by applicable law.

3.18   **Change in Terms.** You agree to be bound by any amendments including but not limited to, changes to existing and additional terms, of the Contract after notice has been sent to you at your last known address contained in our records, or upon our posting of such notice in the lobby of our banking center offices. Where prior notice of a change in terms is required by the Contract or by applicable law, we will send the notice to you the required number of days in advance of the effective date of the change.

3.20   **Notice.** All notices we are required to send to you may be sent electronically (when available), or by U.S. mail, mailed from anywhere in the United States, to the last address shown for you on our records.

Any notice that we receive after 2:00 p.m. on a Business Day may be considered received on the next Business Day.

If you have any questions about your Account, you want to send us notice or in case of errors, you can call the telephone number on your statement or use the address below. Unless otherwise stated in this Contract or required by law, notices you send to us shall be effective no later than two days after receipt.

Comerica Bank - Michigan and Florida Markets
Customer Service Center
P.O. Box 75000
Detroit, Michigan 48275-2310

Comerica Bank - Texas Market
Customer Service Center
P.O. Box 650282
Dallas, Texas 75265-0282

Comerica Bank - Western Market
Customer Service Center
P.O. Box 2249
San Jose, California 95109

3.22   **Section Titles.** Section titles in this Contract are for convenience only and are not to be construed as part of the Contract or as a limitation on the particular section to which they refer.

3.24   **Miscellaneous.** Unless otherwise stated, the benefits and responsibilities of this Contract will transfer to your heirs, personal representatives, executors, administrators, successors or anyone to whom you transfer an Account pursuant to this Contract. The same benefits and responsibilities will also transfer to our successors and assigns. This Contract is not intended for the benefit of any entity or person other than you and the Bank.

12

**We reserve the right to monitor and record any telephone conversation and retain copies of any electronic mail you send us, but will have no liability for failing to do so. You agree that we may record telephone conversations and retain such electronic mail without any further notice to you or any other parties.**

If we waive or otherwise fail to enforce our rights on any occasion under this Contract, we may still insist on full enforcement in the future. If there is a conflict between a provision(s) of this Contract and statements of an employee of the Bank or of Comerica Incorporated, the terms of this Contract will control.

If any part of this Contract is determined to be unenforceable, the rest will remain in full force and effect.

3.26   **Amounts Due Bank.** You agree that, in our sole discretion, and limited only as required by law, we may add to the outstanding balance of any loans (except for Western Market real estate secured loans) we have made to you, any amounts you owe us pursuant to this Contract, including but not limited to Service Charges and Overdrafts. Interest will accrue on such amounts at the rate provided in the underlying loan document, and such amounts will be secured by any collateral securing the remaining balance on the loan(s) we select.

3.28   **Deposit Insurance.** Your Accounts with us are insured to the regulatory limits by the Federal Deposit Insurance Corporation (FDIC). Please note that deposits held in separate markets are not separately insured, but are combined to determine whether a depositor has exceeded the federal deposit insurance limit. For further information regarding insurance, you may write to the FDIC at 550 17th Street, N.W., Washington, D.C. 20429, telephone the FDIC's toll-free customer hotline at 877.ASK.FDIC (877.275.3342), or visit its website at www.fdic.gov.

5.00   **Additional Terms for Statutory Accounts**

5.02   **Uniform Transfer to Minors Account.** If your Account is designated on the Signature Card as a Uniform Transfer to Minors Account or Uniform Gift to Minors Account or "UTMA" "UGTM" or similar designation, notwithstanding any other provisions of this Contract, you agree that the ownership, control and distribution of the funds in the Account will be governed by state law, as such may be amended, revised or enacted from time to time. Only one beneficiary and one custodian may be named for each such Account you open. If your Account was opened in Michigan on or after December 29, 1998, the Michigan Uniform Transfer to Minors Act governs your Account, regardless of how the Account is on the Signature Card.

5.04   **Statutory Trust Account.** If your Account is designated on the Signature Card as a Statutory Trust Account (also referred to as In Trust For [ITF] or Payable on Death [POD] Account), notwithstanding any other provisions of this Contract, you agree that the ownership, control and distribution of the funds will be governed by state law, as such law may be amended from time to time. Unless we agree otherwise, only one beneficiary may be named for each Statutory Trust Account you open. A withdrawal by an Owner of the funds in the Account, pledging or assigning the Account, closing the Account or changing the beneficiary will be considered revocation of the trust by all of the Owners, to the extent of the withdrawal, pledge, assignment, or change.

If we agree to permit you to name more than one beneficiary for a Statutory Trust Account and the Account is not revoked prior to the death of the last surviving Owner then, unless we otherwise agreed in writing, we will distribute the funds remaining in the Account upon the death of the last surviving Owner in equal proportions to the named beneficiaries who did not predecease the last surviving Owner. The estate of a named beneficiary who predeceased the last surviving Owner will not be entitled to any of the funds in the Account. Each surviving beneficiary will be a joint Owner with each other surviving beneficiary with respect to the funds in the Account without rights of survivorship.

Notwithstanding anything above to the contrary, if you opened your Account at one of our Texas banking centers and designated it a POD or Trust Account, with more than one Owner or Trustee, respectively, each of you will own the Account with rights of survivorship, and in proportion to your net contributions to the Account. In Texas, POD and Trust Accounts are each subject to different additional laws.

You may wish to consult with an attorney concerning the estate planning implications for each type of Statutory Trust Account.

6.00   **Funds Availability Policy.** This policy governs deposits to Checking Accounts and, for Accounts opened in our Western Market, deposits to Savings Accounts.

6.02   **General Availability of Funds Deposited.** Our policy is to generally make funds from your cash and check deposits available to you on the first Business Day after the day we receive your deposit. Electronic direct deposits will be available on the day we receive the deposit. Although ATM deposits are generally available on the second Business Day after the Business Day of deposit, at least $200 of the deposit is usually made available on the day of the deposit unless we advise you otherwise. Deposits of Comerica Cashier's checks, Teller checks, Official Checks, On-us checks (check drawn on Comerica Bank), Certified checks, Federal Reserve Bank checks, Federal Home Loan Bank checks, state or local government checks (if deposited in the issuing state), U.S. Treasury checks, and Travelers Cheques, must be deposited in person by the payee(s) at a Comerica Bank banking center teller to receive next day funds availability, otherwise, if deposited at an ATM, the funds from these items will not be available to you until the second Business Day following the Business Day of your deposit. Once funds from your deposit are made available to you, you can withdraw the funds in cash and we will use the funds to pay checks that you have written. Please keep in mind, however, that after we made funds available to you, and you have withdrawn the funds, you are still responsible for checks you deposit that are returned to us unpaid and for any other problems involving your deposit.

For determining the availability of your deposit every day is a Business Day except Saturdays, Sundays, and federal holidays. If you make a deposit before our cutoff hour on a Business Day that we are open, we will consider that day to be the day of your deposit. Our cutoff hour for deposits at an ATM is noon. The cutoff hour for deposits made to a teller at a banking center is 2:30 p.m. The earliest cutoff hour that may apply to all other deposits is 2:00 p.m. If you make a deposit after these hours or on a day we are not open, we will consider that the deposit was made on the next Business Day we are open.

6.04   **Longer Delays May Apply.** In some cases we will not make all of the funds available to you on the first or second Business Day after the day of your deposit as stated above. For Customers whose Account has been opened less than 30 days see section 6.06 as well. Funds from your deposited check(s) may be delayed for up to 7 Business Days after the day of your deposit, if:

1. We believe the check deposited will not be paid,

2. You deposit checks totaling more than $5,000 on any one day,

3. You redeposit a check that has been returned unpaid,

4. You have overdrawn your Account repeatedly in the last six months,

5. There is an emergency, such as a failure of communications or computer equipment, or

6. You are a new customer (See Section 6.06).

We will notify you if we delay your ability to withdraw some or all of the funds for any of these reasons and we will tell you when the funds will be available. If your deposit is not made in person, e.g. a Comerica ATM, or night deposit or we decide to take this action after you have left the premises, we will send you a notice no later than the first Business day following the Day facts become known to us that allow us to delay availability of the deposited funds.

6.06   **Special Rules for New Customers.** If you are a new customer, the following special rules may apply during the first 30 days your Account is open:

a. The first $5,000 from a deposit of U.S. Treasury checks (if they are payable to you) will be available on the first Business Day after the day of your deposit.

b. Funds from electronic ACH direct deposits to your Account will be available on the day we receive the deposit. Funds from deposits of cash, wire transfers, and the first $5,000 of a day's total deposits of cashiers, certified, tellers', travelers', and federal, state and local government checks will be available on the first Business Day after the day of your deposit, if the checks are payable to you. If your deposit of these checks (other than a U.S. Treasury check) is not made in person to one of our employees, the first $5,000 will not be available until the second Business Day after the day of your deposit.

c. The excess over $5,000 from the above deposits will be available on the ninth Business Day after the day of your deposit.

d. Funds from all other check deposits will generally be available on the ninth Business Day after the day of your deposit.

e. Funds from deposits made to a ComeriSafe will be available for all purposes on the first Business Day after the courier we have approved notifies one of our employees that a deposit has been made.

6.08    **Holds on Other Funds.** If we cash a check for you that is drawn on another bank, we may withhold the availability of a corresponding amount of funds that are already in your Account. Those funds will be available at the time funds from the check we cashed would have been available if you had deposited it.

If we accept a check for deposit that is drawn on another bank, we may make funds from the deposit available for withdrawal immediately but delay your availability to withdraw a corresponding amount of funds that you have on deposit in another Account you have with us. The funds in the other Account would then not be available for withdrawal until the time periods that are described elsewhere in this policy for the type of check deposited and the manner in which you deposited it.

7.00    **Electronic Funds Transfers Policy.** There are several types of electronic funds transfer ("EFT") services available to you pursuant to the Contract, including, but not limited to, ACH deposits and withdrawals, Electronic Check Conversion including those checks that you authorize the merchant or payee to convert, and other third party initiated transactions, telephone requests, transfers requested from your personal computer, and transfers, deposits, and withdrawals you can make with a Card or PIN. This part of the Contract specifically addresses your rights and obligations with respect to such electronic transactions, but does not govern those circumstances in which we debit your Account for amounts you owe us. By receiving a Card or PIN issued or authorized by us, after your application for the Card or PIN is approved, or by making a deposit or requesting a transfer or withdrawal by telephone or electronically, you agree to the following terms. We may require you to sign separate agreements for certain electronic banking services. The terms and conditions in those agreements will control to the extent they conflict with this Contract.

7.02    **Transactions Available.** Unless we advise you otherwise, to the extent that we approve your request to do so, you may use your Card and/or PIN to:

a. Withdraw cash from your linked Account.

b. Make deposits to your linked Account.

c. Transfer funds between your linked Accounts whenever you request.

d. Pay for purchases at places that have agreed to accept the Card up to the Available Balance in the linked Account or $500 ($2,500 for business customers), whichever is less, on the day the transaction is processed. See Section 2.30 for overdraft protection limitations using the Card.

e. Pay bills directly by telephone or personal computer from your linked Checking Account in the amounts and on the days you request.

f. Obtain cash using your Comerica Check Card or Comerica Business Check Card up to the Available Balance in the linked Account or $500 ($2,500 for business customers), whichever is less, on the day the transaction is processed. See Section 2.30 for overdraft protection limitations using the Card.

g. Determine Account balances.

h. Order checks.

Balance information may not reflect recent transactions, and may include funds which are not available for immediate withdrawal. Deposits and payments made at ATMs are subject to later verification by the Bank. You may need to apply for permission to use some or all of these services, and some of these services may not be available at all terminals.

7.02.02    **Telephone and IVR Transfers and Inquiries.** If we have approved your request for a PIN, you can use a touch-tone telephone to obtain information on your Accounts. Balance information may not reflect recent transactions, and may include funds not available for immediate withdrawal.

Where available, you can use a touch-tone telephone to transfer funds from one of your linked Accounts to another, and to place a stop payment order on

a check drawn on your linked Account. Funds transfers must be requested on a Business Day by 8:00 p.m. ET in order to be effective as of that Business Day, except that for Accounts opened at one of our Texas banking centers, the Business Day cut off time is 2:00 p.m. CT Monday - Thursday, and 4:00 p.m. CT Friday.

7.04    **Other Agreements.** Except where this Contract provides otherwise, any transaction you conduct electronically remains subject to the terms of the applicable agreement(s) between us, including, but not limited to, Check Card, Business Check Card, Comerica Web Bill Pay®, Comerica Web Banking℠, Credit Card, line of credit, wire transfer, funds transfer, and/or loan agreement. Any charges and/or minimum balance requirements applicable to maintaining or transacting business in an Account will be applicable even when electronic transfer services are utilized. You are responsible to know the amount of available funds you have in your Account prior to initiating a transaction or authorizing a transaction that will reduce the balance in your Account.

7.06    **Documentation of Transfers.**

7.06.02    **Card Transactions.** You will receive the following documentation with respect to Card Transaction(s):

a. At the time you make a transaction, you will be offered a receipt unless the transaction is $15 or less.

b. You will receive a monthly statement for each Account in which an electronic transaction has occurred. In any case you will get a statement at least quarterly.

7.06.04    **Preauthorized Deposits: Personal Accounts.** You will receive a monthly statement for each month in which you have an electronic transfer involving your Account. If you have arranged to have a direct deposit to your Personal Account at least once every 60 days, that amount will be credited to the Account you designate. You may call us at the telephone number that appears on your monthly Account statement to see if the deposit has been made. In any case you will be sent a statement at least quarterly.

7.08    **Stop Payment and Notice of Varying Amounts (Preauthorized Transfers): Personal Accounts.** If you have told us in advance to make regular payments out of your Personal Account, you can stop any of these payments by calling us or writing us using the telephone number or address in Section 7.16, in time for us to receive your request three Business Days or more before the payment is scheduled to be made. If you call, we may also require you to put your request in writing and get it to us within 14 days after your call. If you request that we stop one of these payments three Business Days or more before the transfer is scheduled, and we do not do so, we will be liable for your losses or damages, subject to the limitations on our liability in Section 3.06. If you want to stop all such payments made to a particular entity, you must notify that entity and provide us a copy of the notification.

If the payments you are making vary in amount, the person you are going to pay will tell you 10 days before each payment, when it will be made and how much it will be. You may choose instead to get this notice only when the payment would differ by more than a certain amount from the previous payment, or when the amount would fall outside certain limits that you set. Please notify the person you are going to pay of your preference.

7.10    **Our Liability for Failure to Make Transfers.** We will not be liable to you for our failure to make a transfer if:

a. through no fault of ours, you do not have enough money in your Account for the transfer;

b. the transfer would exceed the credit limit on your line or exceed your daily withdrawal limit;

c. in a Card transaction, the ATM you are using for the transfer does not have enough cash or travelers checks to complete the transaction;

d. circumstances beyond our control, such as flood, fire, computer malfunction, or an interruption in electric or telephone service, interfere with the transaction;

e. in a Card transaction, the terminal was not working properly and you knew about the breakdown when you started the transfer;

f. your Card has been reported lost or stolen or we have a reasonable basis for acting to protect the security of your Account;

g. there are unusual or extraordinary circumstances which indicate improper or unlawful use of your Account.

h. information necessary for us to complete the transfer is inaccurate or incomplete;

i. the funds are subject to legal process or other encumbrances restricting such transfers;

j. this Contract has been terminated; or

k. applicable law prevents completion of the transfer.

There may be other exceptions described in our other agreements with you.

**Personal Accounts.** Except as noted above, we will be liable for your damages proximately caused by our failure to make a transfer to or from your Personal Account(s) under this Contract, subject to the limitations on damages in Section 3.06.

7.12   **Personal Identification Number (PIN).** A Card is issued and, except as stated in this section, may be used only in connection with a PIN. In addition, certain transactions may be conducted with a PIN even if you do not have a Card. When using a Comerica Check Card or Comerica Business Check Card, a PIN is not required for cash advances at banking centers or for purchases from merchants that accept the Card; security is maintained by your signature on a receipt. This may also be true of certain purchases made at some merchants with your Card. All other transactions initiated by a Comerica Check Card or Comerica Business Check Card including ATM transactions and purchases at merchants accepting the Card, will require a PIN. If the security of the PIN is compromised, notify us at once by using the telephone number and/or address listed in Section 7.16.

7.14   **Your Liability for Unauthorized Electronic Fund Transfers:**

1. **Personal Accounts.** Tell us AT ONCE if you believe your Card or PIN has been lost or stolen, or if you believe that an electronic fund transfer has been made without your permission using information from your check. Telephoning is the best way of keeping your possible losses down. You could lose all the money in your account (plus your maximum overdraft line of credit).

   If you tell us within two business days after you learn of the loss or theft of your Card or PIN, you can lose no more than $50 if someone used your Card or PIN without your permission. If you do NOT tell us within two business days after you learn of the loss or theft of your Card or PIN, and we can prove we could have stopped someone from using your Card or PIN without your permission if you had told us within 2 business days of learning of the loss or theft of your Card or PIN, you could lose as much as $500. However, if you are a California Account Owner, this $500 liability provision for failing to notify us within two business days after you learn of the loss or theft of your Card or PIN does not apply to you.

   If your Account statement shows electronic transfers that you did not make, including those made by Card, PIN or other electronic means, TELL US AT ONCE. If you do not tell us within 60 days after the statement was mailed or otherwise made available to you, you may not get back any money you lost after the 60 days if we can prove that we could have stopped someone from taking the money if you had told us in time. If a good reason (such as a long trip or a hospital stay) kept you from telling us, we will extend the time periods.

   *Telephoning us at 800.572.6620 as soon as you realize your Card or PIN has been lost or stolen, or that your Card or PIN has been used to conduct transactions you did not authorize, or that there has been any unauthorized electronic transfers conducted through your Account, is the best way of minimizing your possible losses.*

2. **Business Accounts.** Tell us AT ONCE if you believe your Card or PIN has been lost or stolen, or that someone may be using your Card or PIN without your authority, or that an electronic fund transfer has been made without your permission. Telephoning is the best way of keeping your possible losses down.

   You are liable for all transactions, including unauthorized transactions, made with your Business Check Card or PIN, or any other electronic funds transaction that occurred prior to the time you notify us to cancel your Card or that an unauthorized transaction has taken place, or that your Card or PIN has been lost or stolen. It is important that you review your statements closely, and quickly report unauthorized electronic and Card/PIN transactions to prevent further unauthorized use of your Card and Account and loss to you.

If however, you notify us of unauthorized Card/PIN transactions within 30 days of when first mailed the statement or otherwise made the information available to you, we will attempt to obtain through the Visa® Card claim process, a reversal or credit for the amount of the claimed unauthorized Card transaction(s), if the facts and circumstances are such that the transaction can be reversed or a credit can be obtained for the amount of the transaction, but we will have no liability to you for your claim or any claims that we could have prevented had you told us in a timely manner and we could have prevented your claimed losses had you done so. If the electronic transaction occurred through the use of one of your Comerica Treasury Management Services, Comerica Web Banking® or Bill Pay for Small Business your rights and liability and our rights and liability may be different then those stated in this Section 7 and are governed by your agreement with us for those services. To the extent that there is a conflict between the provisions of this Section 7 and such other agreements, the terms of the other agreements shall prevail but only to the extent of the conflict.

3. **Additional Liability Protection for Check Cards (Personal and Business).** Notwithstanding (1) and (2) above, you will not be liable for certain transactions involving the use of your Card that is linked to your Account, if you immediately report to us the unauthorized use of your Card and:

   a. the unauthorized transaction was (i) a signature based Card purchase or (ii) a PIN-based Card purchase (ATM withdrawal transactions and cash advances are excluded), and

   b. We do not find that the transaction resulted because of your gross negligence or fraud.

7.16   **In Case of Errors, Questions, or to Report a Lost or Stolen Card or PIN.** Telephone us or write us at the number or address below as soon as you can, if you believe your Card or PIN has been lost or stolen, or the statement, receipt or other transaction information we provide to you is wrong or if you need more information about a transaction. Telephoning is the best way to tell us if your Card or PIN has been lost or stolen.

800.572.6620

Comerica Bank
Electronic Processing
P.O. Box 75000
Detroit, MI 48275-7584

a. Tell us your name and Account number.

b. Describe the error or the transaction you are unsure about, and explain as clearly as you can why you believe it is an error or why you need more information.

c. Tell us the dollar amount of the suspected error.

If you tell us orally, we may require that you send us your complaint or question in writing within ten Business Days. If you fail to do so, and your Account is a Personal Account, we are not obligated to give you provisional credit for the amount of your claim while we investigate your claim. If your Account is a Business Account we are not obligated under any circumstances to give you provisional credit while we investigate your claim and if you do not provide us your written complaint when requested, we are under no obligation to investigate your claim or question.

**Personal Accounts; Error Resolution Requirements.** If your Account is a Personal Account, we must hear from you no later than 60 days after we sent or otherwise made available to you the first statement on which the error or problem appeared. If you notified us within 60 days after the error was sent or otherwise made available to you the first statement on which the error or problem appeared, we will determine whether an error including an unauthorized transaction occurred within 10 Business Days (20 Business Days for new Accounts) after we hear from you. We will correct any error promptly. If we need more time, we may take up to 45 days (90 days for new Accounts, point of sale transactions and certain foreign transactions) to investigate your complaint or question. If we decide we need more time, we will credit your Account within 10 Business Days (20 Business Days for new Accounts) for the amount you think is in error, so that you will have the use of the money during the extra time that it takes us to complete our investigation. However, if we have asked you to put your complaint or question in writing and we do not receive it within 10 Business Days from our

request, we will not be obligated to credit your Account while we continue to investigate your claim. We will tell you the results within three Business Days after completing our investigation. If we decide that there was no error, we will send you a written explanation. You may ask for copies of the documents that we used in our investigation.

**Business Accounts; Error Resolution Requirements.** We will investigate claims that you report to us only if you:

a. provide a written statement of your claim if we request it in writing,

b. report them to us within 30 days after we sent or otherwise made available to you the first statement or other documentation we provided to you on which the error or problem appeared and,

c. the loss being claimed is subject to reversal or **reimbursement as set forth in this Contract.**

7.19   **Illegal Transactions.** You agree that you will not use your Card for any illegal transactions.

7.20   **Unauthorized ACH Transfers.** In addition to reporting unauthorized ACH debit transactions from your account, as provided in 7.14 & 7.16 above, you agree to provide us with a written statement in, a form acceptable to us, declaring that the ACH debit transaction was not authorized by any Owner or Authorized Signer of the Account. If the unauthorized transaction was an ACH credit to your Account, notify us as soon as possible.

7.22   **Merchants' Disputes.** If your Account is subject to Michigan law, and you use your Card, and a dispute with the merchant arises, you agree to make a good faith effort to settle the dispute with the merchant. Once such a Card transaction has been completed, you can request that it be reversed only in very limited circumstances. We will agree to reverse it only if it involves $50 or more and you notify us of the problem, and assure us you have returned any returnable goods at issue, within four days of the transaction. Oral notification must be confirmed in writing within 14 days.

7.24   **Termination.** A Card will remain our property and you agree to return the Card to us upon demand. Without prior notice, we may revoke or cancel the Card and terminate this Contract for any reason. You may terminate the Contract, as it relates to the use of a Card, at any time by returning your Card to us. Termination, whether by you or by us, will not affect prior transactions or then existing obligations. For your security and protection we may terminate your Card without notice due to non-use and we may do so without regard to any previous non-use that may have occurred with your Card. If your Card is terminated for non-use, you may still use your current PIN for telephone and IVR transfers and inquiries.

7.28   **Daily Withdrawal and Transaction Limit.** For security reasons, there are limits on the amount you may withdraw through an ATM, purchase, or obtain in over-the-counter cash advances, in any one day using your Card. We have provided you with your daily Card withdrawal limit. We reserve the right to increase or decrease that limit without prior notice to you. If we change your limit we will notify you in writing. You may reduce your daily withdrawal limit by providing written notice to us. Such reduction will be effective no later than ten days following our receipt. You are limited to 20 Comerica Check Card or Comerica Business Check Card merchant transactions per day. Note: When you use your Card at certain merchants, including hotels, restaurants, and car rental agencies, the merchant may place a hold on your Account for the expected amount of the transaction which may be greater than the final transaction amount. You agree we may place a hold on sufficient funds to cover the amount of the authorized transaction pending it's final settlement even if that amount exceeds the actual amount of the transaction. This could affect the balance available to cover other transactions.

7.30   **Required Michigan Disclosure – Regulatory Agencies.** If your Account is subject to Michigan law and you believe we have violated applicable Michigan law concerning this part of the Contract, you may notify the Bank and Trust Division, Michigan Office of Financial and Insurance Services, 333 South Capital Avenue, Suite A, P.O. Box 30224, Lansing, 48909; or Texas Department of Banking, 2601 North Lamar Boulevard, Suite 300, Austin, TX 78705-4294.

7.32   **ATM Safety.** We cannot guarantee your safety while using the ATM. Please exercise discretion in your use of ATMs.

• Prepare deposits at home to minimize your time at the ATM.

• Be careful when using the ATM and beware of the surroundings, especially at night in isolated areas. At night, park near the ATM in a well-lighted area and have someone accompany you when possible. Do not approach a dark ATM.

• Do not accept assistance from anyone while using the ATM.

• Do not display your cash; pocket it and count it later in the safety of your own office or home.

• If you notice anything suspicious while transacting business at the ATM, cancel the transaction, pocket your Card and leave.

7.34   **Originating Funds Transfer by Wire or ACH.** To originate a wire transfer or ACH transaction you must enter into a separate agreement with us for such services. Your wire transfer or ACH transaction will be governed by the terms of that agreement. If we, in our sole and absolute discretion, execute a wire transfer or ACH transaction on your behalf without having a separate agreement from you, and we debit your Account for all or a portion of the amount of the wire transfer or ACH transaction, you agree that we may process the transfer/transaction if we believe it was transmitted or authorized by you and we confirmed the authenticity of the payment order by placing a telephone call to an Authorized Signer on the Account to be debited for the transfer/transaction, if no Account Owner or Authorized Signer appeared before us at a banking center to request the transfer/ transaction. If an Authorized Signer or Owner confirms the payment order, the payment order will be deemed authenticated and effective and we may debit the Account or if there are insufficient funds in the Account we may allow the Account to be overdrawn. If we cannot reach an Authorized Signer or Owner, or if the payment order is not confirmed or approved in the manner we require, we may refuse to execute the payment order.

7.34.02   **Acceptance.** A payment order is considered accepted: (1) when we pay the beneficiary or give notice of receipt of the order; (2) when we receive payment of the entire amount of the sender's order; (3) upon the opening of the next Funds Transfer Business Day after the payment day of the order if the order was not rejected within one hour of the opening of the Funds Transfer Business Day and funds are available for payment.

7.34.04   **Provisional Payments.** Any electronic payment we credit to your Account is provisional until we receive final settlement for the payment. If we give you provisional credit but do not receive final settlement, you become obligated to us for the full amount without prior notice or demand.

7.34.06   **Cancellation, Amendment and Reversal.** We may, in our sole discretion, act upon a request you make to amend or cancel a payment order you have given us. We may also act upon a cancellation request by an originator by debiting your Account and sending the funds back to the originating bank.

7.34.08   **Discrepancies in Payment Order.** If we receive a payment order and the Account number for the designated beneficiary is a valid Bank Account number, we may credit the payment order to that Account whether or not a beneficiary's name corresponds with the name on the Account.

7.34.10   **Rejection.** We reserve the right to reject any payment order you request for any reason, including the fact that you have not executed a separate Funds Transfer Agreement or do not have sufficient funds in your Account to fund the requested transfer and associated fees. We may notify you of any such rejection in the same manner that you made the request, or by facsimile or telephone notice to any Authorized Signer on the Account, if the Account is used to fund the transfer. Any such notice is effective upon transmission, telephone call, or mailing, as applicable.

7.34.12   **Payment of Payment Orders and Fees.** You agree to pay the amount of any payment order and associated fees in advance by certified check, cashier's check, money order, or by debit against your Account. You agree to be bound by any payment order we send pursuant to this Contract in compliance with our security procedures applicable to occasional wire transfers.

7.34.14   **Fedwire.** Fedwire is the funds transfer system of the United States Federal Reserve Banks. Financial institutions may use Fedwire to make funds transfers to you. If any part of a funds transfer is carried by Fedwire, your rights and obligations regarding the funds transfer are governed by the rules and regulations of the Federal Reserve Board.

7.34.16   **Notice of Receipt of ACH Items.** We are not required to give you a separate notice of our receipt of an ACH transaction for your Account. However, we will notify you of the receipt of such payments in the periodic statements we provide to you.

7.34.18   **Notice of Receipt of Non-ACH Items.** With the exception of ACH electronic payments, which are discussed above, and internal funds transfers, we will notify you when we accept any payment order naming you, or an Account you own, as beneficiary or instructing us to notify you of receipt of the order. You agree that such notice shall be given no later than two Funds Transfer Business Days after the order is received and may be provided to you at the address shown in our records, electronically, or by any other means which we deem appropriate under the circumstances. Such notice shall be effective when sent. You agree that notification by receipt is not required for ACH electronic payments and internal funds transfers, instead notification is sufficient by listing the ACH electronic payment or internal funds transfer on your deposit account statement.

7.36   **Foreign Check Card Transactions.** The exchange rate between the transaction currency and the billing currency used for processing international transactions is a rate selected by Visa® from the range of rates available in wholesale currency markets for the applicable central processing date, which rate may vary from the rate Visa® itself receives, or the government mandated rate in effect for the applicable central processing date, in each instance, plus three percent. The day of conversion by Visa® may differ from the purchase date and the posting date identified on your statement. You agree to pay the charges and accept credits for the converted transaction amounts in accordance with the terms of this paragraph.

8.00   **Special Rules for Sweep Arrangements.**

**Deposits will be FDIC insured to the extent permitted by law. FUNDS SWEPT OUT OF AN ACCOUNT INTO NON-DEPOSIT ACCOUNTS, SUCH AS LOAN ACCOUNTS OR INVESTMENT ACCOUNTS (SECURITIES, MUTUAL FUNDS) ARE NOT "DEPOSITS" FOR PURPOSES OF FEDERAL DEPOSIT INSURANCE. IN THE EVENT WE FAILED, YOU WOULD HAVE GENERAL CREDITOR STATUS FOR THE FUNDS THAT WERE SWEPT INTO AN INVESTMENT ACCOUNT.**

8.02   **Definitions.**

8.02.02   *Core Checking Account* is a Checking Account from which we will automatically transfer ("sweep") and invest deposits in Securities, an interest-bearing Account, and/or for business sweep arrangements, the loan we make available for that purpose, pursuant to your standing instructions, if we agree to establish a sweep arrangement for you.

8.02.04   *Designated Account* is an interest bearing Account into which deposits to your Core Checking Account may be automatically transferred pursuant to your standing instructions, stated in the Acceptance, if we approve your request for a sweep arrangement. In some cases we may permit you to arrange for the funds to be transferred to an Account held at one of our affiliates.

8.02.06   *Investment Account* is an account that may be established for you by or through Comerica Securities (which may act as our agent) or Comerica Bank's Institutional Trust Department, into which deposits to your Core Checking Account may be transferred automatically pursuant to your standing instructions (stated in the Acceptance), if we approve your request for a sweep arrangement.

8.02.08   *Target ("Threshold") Balance* is the minimum dollar amount you agree in the Acceptance that the Core Checking Account will maintain at all times.

8.02.10   *Securities* means any money market mutual funds or other securities, including those offered by or through our broker dealer affiliate, Comerica Securities. **SECURITIES ARE NOT FDIC INSURED, ARE NOT DEPOSITS OR OTHER OBLIGATIONS OF BANK AND ARE NOT GUARANTEED BY BANK. SECURITIES ARE SUBJECT TO INVESTMENT RISKS, INCLUDING POSSIBLE LOSS OF THE PRINCIPAL INVESTED.**

8.04   **Business Sweep Arrangements.**

8.04.02   **Transfer Options.** If we establish a business sweep arrangement for you, you may elect to have deposit balances in the Core Checking Account automatically transferred to an Investment account, a Designated Account and/or to a designated revolving loan account at Bank or, in some cases, one of our affiliates ("Loan"). Your election must be made in the Acceptance, but you may change your election upon 7 days' written notice.

   a. If you elect to establish an Investment account, you specifically authorize us to instruct Comerica Securities or the Institutional Trust Department of Bank to (1) transfer funds from the Core Checking Account to the Investment account for the purchase of Securities, and (2) to sell or cause to be sold Securities on your behalf and to transfer the proceeds to the Account pursuant to this Agreement. You agree to execute any documents required by Comerica Securities or the Institutional Trust Department in order for it to honor such instructions.

   b. You may elect in the Acceptance (or thereafter on 7 days' written notice) to have all or a designated portion of deposit balances in the Core Checking Account transferred to apply to the Loan. If you make such an election, you remain obligated on the terms of the Loan, including the obligation to make timely payments, whether or not there are sufficient funds to apply to the Loan at any given time. You may change your election on 7 days' written notice.

8.04.04   **Transfers.** On each Business Day, we will calculate the Collected Balance in the Core Checking Account, and will transfer from the Core Checking Account to the Investment account, Designated Account and/or Loan the amount of the Collected Balance that exceeds the Target Balance.

   If the Collected Balance is less than the Target Balance, we will:

   a. Transfer funds from the Designated Account to the Core Checking Account; or

   b. Instruct Comerica Securities or (as applicable) the Institutional Trust Department, to sell or cause Securities to be sold, and transfer the proceeds to the Core Checking Account, in an amount sufficient to cover all debits to the Core Checking Account, and if funds are available, to return it to the Target Balance.

   If there are insufficient funds in the Designated Account, and/or proceeds from the sale of Securities, to transfer to the Core Checking Account to cover all debits and to meet the Target Balance, we will on your behalf draw advances under the line of credit available under the Loan, if applicable. If insufficient funds are available under the above procedures, we may elect in our discretion to contact you for instructions or to not honor items.

8.06   **Personal Sweep Arrangements.**

8.06.02   **Transfer Options.** If we establish a personal sweep arrangement for you, you elect to have deposit balances in the Core Checking Account transferred automatically to an Investment account. You specifically authorize us to (a) transfer funds from the Core Checking Account to the Investment account for the purchase of Securities, and (b) to instruct Comerica Securities to sell or cause to be sold the Securities on your behalf and to transfer the proceeds to the Core Checking Account pursuant to this Agreement. You agree to execute any documents required by Comerica Securities in order for it to honor such instructions.

8.06.04   **Transfers.** On each Business Day, we will calculate the Available Balance in the Core Checking Account and we will transfer from the Core Checking Account to the Investment account the amount of the Available Balance that exceeds the Threshold Balance. If the Available Balance is less than the Threshold Balance, we will instruct Comerica Securities to sell or cause Securities to be sold, and transfer the proceeds to the Core Checking Account, in an amount sufficient to cover all debits to the Core Checking Account, and to return the Core Checking Account to the Threshold Balance.

8.08   **Terms Applicable to All Sweep Arrangements.**

8.08.02   **Transfers and Withdrawals.** Transfers made from the Core Checking Account pursuant to this Agreement will be made at the end of each Business Day, however, any Securities purchased with the transferred funds will be purchased no earlier than the beginning of the next Business Day. Withdrawals from the sweep arrangement can only be made through the Core Checking Account.

You authorize us as your order to us, with or without prior notice to us, to transfer and withdraw funds from any Account or Investment Account into which your funds are swept, to offset any overdraft or other liability you owe us.

8.08.04 **No Investment Advice.** Nothing in this Contract will be construed as our providing investment advice to you. You acknowledge that we have made no representations or recommendations as to the appropriateness or quality of any Securities and that our employees are not authorized to do so. We will not be liable for any losses you may suffer as a result of any decline in value of any Securities you purchase pursuant to this Contract.

You agree and expressly acknowledge that we are acting on your behalf for the limited purpose of transferring funds to other accounts for such purchases, as described herein. However, we are not acting as your broker, dealer or investment adviser in connection with any such purchases, and expressly disclaim any such role. Investments in securities involve certain risks, about which you should seek separate investment advice.

8.08.06 **Liability.** We will not be liable for any losses you may suffer resulting from the fluctuation in value of any Securities because of any delay in transferring any funds to your Investment account, or for the selection of particular Securities to be sold to restore the Core Checking Account balance. We accept no liability for the actions or failure to act of any person not a party to this Contract, including Comerica Securities or any of our other affiliates.

You agree to hold us harmless from loss or delay caused directly or indirectly by any inconsistencies between days and hours of operation among Comerica Bank, applicable markets and investment companies, or any other conditions beyond the control of Comerica Bank or Comerica Securities.

8.08.08 **Balances.** If you establish an Investment account, the Core Checking Account balance stated in ATM receipts and through other electronic media is the balance upon which you may write checks and make transfers and withdrawals. The stated balance may include funds invested in Securities, which are NOT FDIC insured.

9.00 **Special Terms for Controlled Disbursement Accounts Opened at Comerica Bank & Trust, N.A.**

If you open a controlled disbursement Account with us, you will also be establishing a non-interest bearing Account at Comerica Bank & Trust, N.A. You may not make deposits (electronic or otherwise) to, or take cash or wire transfer withdrawals from, that Account. In order to establish a controlled disbursement Account, you must enter into a separate agreement, which will govern access to the Account and applicable Service Charges. Your controlled disbursement Account will be subject to the rules and regulations of the Office of the Comptroller of the Currency. Except as stated above, this Contract governs the Account to the same extent it governs any other Checking Account. In the event of a discrepancy between this Contract and the controlled disbursement agreement, the latter agreement will control.



comerica.com
Member FDIC
Equal Opportunity Lender

# Amendment to Comerica's Business and Personal Deposit Account Contract

### *Effective August 1, 2015, the Comerica Business and Personal Deposit Account Contract is amended as follows:*

**A new sub-bullet "d" has been added to Section 2.06. Other than the reorder of the existing bullets, all other bullets remain unchanged. Sub-bullet "d" has been bolded and the section now reads:**

### 2.06 Joint Owners.

If your Account is designated as jointly owned by two or more persons or entities, as indicated on the Account Signature Card or our records, then each Owner agrees: (a) to be bound by this Contract, any amendments to it and any other agreement between any Owner of the Account and us regarding the Account; (b) to be jointly and individually liable for all Service Charges and overdrafts regardless of whether each Owner participates in or benefits from the transactions; (c) that any one Owner or Authorized Signer may write checks and make withdrawals or other transfers by any means we make available, and regardless of whether the withdrawal or transfer is for all or any portion of the funds on deposit in the Account or is with or without the knowledge or consent of any other Owner; **(d) that any Owner may designate sub-users for the Account in Comerica Web Banking®, and each Owner will be bound by and jointly and individually liable for any resulting use or transactions regardless of whether each Owner participated in, had knowledge of, or gave consent for the sub-user designation;** (e) that any Owner or Authorized Signer may place a stop payment order on checks or other orders drawn against the Account by any other Owner or Authorized Signer; (f) that any Owner may close the Account without the knowledge or permission of any other Owner; (g) that we may exercise our Set Off rights against the Account in the event any one or more of the Owners defaults on any obligation owing to us even if the non-defaulting Owner(s) contributed all or a majority of the funds to the Account; (h) that garnishments against any one or more Owner(s) are subject to our right of Set Off and security interest; (i) that notice given to any Owner or Authorized Signer is notice to all of the Owners, unless a different notice is required by applicable law; and (j) funds in the Account are payable to any one or more of the Owners without the consent of any other Owner.

*The last sentence in section 2.14 has been revised, the section now reads:*

### 2.14 Set Off

You agree that we may, at any time and without prior notice, set off funds in any Account, or any other funds or property in our possession, in which you have an ownership interest for the payment of debts or liabilities, including loans, owed to us by any or all of you, to the fullest extent permitted by law and regardless of the source of the funds in your Account. You understand such action could result in an interest penalty or dishonor of subsequent debits. Our ability to Set Off does not apply to Personal Accounts if the obligation is created under a consumer credit card plan, IRAs or ESAs.

*Section 2.26 has been revised to note that our current rates are available at Comerica.com, the section now reads:*

### 2.26 Payment of Interest for Accounts that Earn Interest

1. Interest Rates. For Accounts that earn interest, our current interest rates and corresponding Annual Percentage Yield (APY) for Personal Accounts are disclosed on the APY Disclosure we provide in person or by mail, as permitted by law or regulation, on the day of Account opening and CD Account renegotiation. For Business Accounts we will provide you the interest rate and at our option the APY for your Account at Account opening and CD Account renegotiation. Our current rates are available online at Comerica.com.

**All references to the term 'Western Market' have been replaced with 'California and Arizona.' These changes apply in sections 3.20 Notice, 3.26 Amounts Due Bank, and 6.00 Funds Availability Policy.**

*Section 6.02 General Availability of Funds Deposited is revised to read:*

### 6.02 General Availability of Funds Deposited.

Except as provided below and in sections 6.04 Longer Delays May Apply and 6.06 Special Rules for New customers and 6.08 Holds on Other funds, our policy is to generally make funds from your cash and check deposits available to you on the first Business Day after the day we receive your deposit.

**Deposits at a Comerica Bank banking center with a teller, generally:**

- if you deposit cash your funds are immediately available
- if you deposit checks drawn on Comerica Bank, then your funds are available on the same business day
- for personal checking Accounts, the Basic Business Checking Account, and the Small Business Checking Account, if you deposit checks not drawn on Comerica Bank, the initial $100 will be available on the same business day with the remainder made available on the first business day after we receive your deposit

**ATM Deposits, generally:**

- if the deposit is under $200, the entire deposit amount would be available immediately
- if the deposit is over $200, the first $200 of the deposit is available immediately and the remainder is then available on the second business day after the business day of deposit, *regardless of item deposited*

**Direct Deposits, generally:**

- if you receive an electronic direct deposit, then your funds are available on the same business day we receive your deposit

Once funds from your deposit are made available to you, you can withdraw the funds in cash and we will use the funds to pay checks that you have written. Please keep in mind, however, that after we made funds available to you, and you have withdrawn the funds, you are still responsible for checks you deposit that are returned to us unpaid and for any other problems involving your deposit.

*The 1st sentence in Section 7.04 Other Agreements is revised to include Comerica Web Banking® and Comerica Mobile Banking®:*

**7.04 Other Agreements**

Except where this Contract provides otherwise, any transaction you conduct electronically remains subject to the terms of the applicable agreement(s) between us, including, but not limited to, Check Card, Business Check Card, Comerica Web Bill Pay,® Comerica Web Banking,® Comerica Mobile Banking,® Comerica Credit Card, line of credit, wire transfer, funds transfer, and/or loan agreement.

---

## ATM SAFETY NOTICE

We cannot guarantee your safety while using the ATM. Please exercise discretion in your use of ATMs.

- Prepare deposits at home to minimize your time at the ATM.
- Be careful when using the ATM and beware of the surroundings, especially at night in isolated areas. At night, park near the ATM in a well-lighted area and have someone accompany you when possible. Do not approach a dark ATM.
- Do not accept assistance from anyone while using the ATM.
- Do not display your cash; pocket it and count it later in the safety of your own office or home.
- If you notice anything suspicious while transacting business at the ATM, cancel the transaction, pocket your Card and leave.



comerica.com